Donald Lee **VIGNEAULT**, Appellant,

v.

The STATE of Texas, Appellee.

No. 64068.

Court of Criminal Appeals of Texas, En Banc.

June 11, 1980.

Rehearing Denied Sept. 17, 1980.

Ken D. Lipscombe, Wharton, Richard L. Manske, El Campo, for appellant.

Jack Salyer, Dist. Atty., Bay City, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Automatic appeal[1] is taken from a conviction for the offense of capital murder pursuant to V.T.C.A. Penal Code, § 19.-

03(a)(2).[2] The jury returned an affirmative finding to each of the two special issues submitted under Article 37.071(b), V.A.C.C.P., and appellant's punishment was consequently assessed at death. Article 37.-071(e), supra.

In the early morning hours of April 26, 1978, appellant, armed with a .45 caliber automatic pistol, entered a 7–11 convenience store in Bay City; the 18 year old deceased, Loretta Jones, was on duty alone in the store. Upon taking the coins and currency from the cash register—a total of approximately $43.00—appellant forced Mrs. Jones at gunpoint to enter his car on the driver's side, and drive across town to the house in which appellant sublet a room. Appellant then directed Mrs. Jones into his bedroom and ordered her to undress. Thereafter, appellant twice had sexual intercourse with the deceased.

Later in the morning, appellant attempted to strangle Mrs. Jones, but, according to his confession, "she put up a big fight and . . . screamed," scratching appellant on his cheek and under his right arm. Appellant hit her in the mouth with his fist, and when his landlord, Kim Thompson, came down the stairs to investigate, appellant came out of the bedroom explaining that nothing was wrong and that Thompson should go back to bed.

At daybreak, appellant advised the deceased that he was going to drop her off out in the country and she would from there have to make her way home. Armed with the .45 automatic pistol, appellant drove the deceased seventeen miles east and then south of Bay City, to a remote rice farming area, and stopped the car. At gunpoint, appellant then forced Mrs. Jones out of the passenger side of the car and directed her to take his penis in her mouth. As Loretta Jones knelt, yielding to this com-

---

1. See Article 37.071(f), V.A.C.C.P.

2. Section 19.03 provides in pertinent part:
   "(a) A person commits an offense if he [intentionally or knowingly causes the death of an individual] under Section 19.02(a)(1) of this code and:

   \* \* \* \* \* \*
   (2) the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery . . . ."

mand, appellant shot her squarely between the eyes at point blank range.[3]

Appellant shot deceased again, in the neck, and a third time, in the back of the head; then the pistol jammed.

At approximately 7:00 a. m., appellant arrived home, and walked into the house with the .45 automatic pistol in his hand. According to Kim Thompson, there was blood all over appellant's pants, some on his shirt and "lots of blood splattered on his hands." He said to Dwane Rickman, another housemate, "Take this piece of junk and fix it" as he handed Rickman the pistol. Thompson asked appellant what had happened, to which he replied, "I just wasted somebody." Appellant then described the abduction, robbery, rape and murder of Loretta Jones to his housemates in detail.

Rickman unloaded and "field stripped" his pistol, giving the barrel to Thompson. Appellant threatened his housemates that he would kill them or have them killed if they "narked on" him. The three then discussed and decided upon an alibi for appellant. Appellant gave Thompson $20.00 of the robbery proceeds to pay off a debt. Appellant and Thompson then left in the latter's car[4] for the South Texas Nuclear Project site where appellant was employed as a construction worker, to pick up his paycheck.[5]

The two stopped at a local elementary school and threw the contents of a small bag of change taken in the robbery across the playground. On the way to the nuclear power plant, Thompson turned off the main road and stopped at the top of a small wooden bridge where he threw the barrel of the pistol into a creek. Later that evening, Rickman became concerned that the spent shell casings might have fingerprints on them, so he and appellant went to look for the body of the deceased, but were unable to find it.

The next day, Thompson again drove appellant to the nuclear project site where appellant obtained his paycheck. Appellant cashed the check and gave Thompson some money in payment for the car. He washed the car, and shortly before noon appellant left for North Carolina. Thereafter, on Sunday, April 30, appellant was arrested in Carthage, North Carolina, at the home of his fiancee, pursuant to a Matagorda County warrant for his arrest. Appellant waived extradition and was returned to Bay City on or about May 4, 1978. On appellant's motion for change of venue, the trial court ordered appellant's trial moved to Wharton County.

By his first ground of error, appellant complains of the trial court's failure to impanel a jury for the purpose of determining his competence to stand trial, presumably, pursuant to Article 46.02, V.A.C.C.P.[6]

The record reflects that appellant filed a timely motion for psychiatric examination and "pre-trial hearing on defendant's competency." The trial court pursuant thereto entered an order directing that two psychiatric examinations of appellant be conducted by different psychiatrists: Neil D. Buie, M.D., and John Nottingham, M.D. The order directed that the purposes of such examinations were to be for determining appellant's present competency to stand trial[7]

---

3. The autopsy of deceased's body revealed a "glancing gunshot track" to the right forearm; it was the opinion of the Harris County Medical Examiner that such wound was consistent with her having thrown up her arm to protect her face as appellant fired this first shot.

4. The car appellant drove on the night of the offense was borrowed from Thompson, and the .45 caliber automatic pistol used to kill the deceased belonged to Dwane Rickman.

5. The evidence reflects that appellant had quit his job the preceding Monday, about two days before commission of the offense. Appellant's check was not ready for him to pick up on this

Wednesday, the latter part of the same day on which the murder was committed.

6. We say "presumably" because this ground of error, as well as others contained in appellant's brief, neither cites this Court to Texas authority, nor refers "to that part of the ruling of the trial court" which is in issue. See Article 40.-09, § 9, V.A.C.C.P.

7. Article 46.02, supra, § 1, provides in part:
"(a) A person is incompetent to stand trial if he does not have:

and his sanity at the time of commission of the offense, and further, that written reports of the respective physicians' examinations be filed with the court within thirty days of September 18, 1978, the day of the order.[8]

Some ten months later—on the day the cause was set for trial—June 12, 1979, the defense filed a "motion for pre-trial hearing to determine the defendant's competency to stand trial," as well as a written "notice of intention to raise evidence of insanity defense." The trial court thereupon convened a hearing at which defense counsel urged the impanelment of a jury for determination of the issue of appellant's competence to stand trial, offering as "evidence to support a finding of incompetency to stand trial"[9] the following:

(1) that appellant had given conflicting accounts of the offense, and was unable to assist his attorneys in preparation of a defense. Stated counsel, "As for example, yesterday making the suggestion that he should ask the court to fire both of his defense attorneys . . . and ask the court that he be allowed to represent himself in a capital murder case;"

(2) that defense counsel had received an oral report from "the psychiatrist" the previous day, but did not know what the psychiatric testimony would be; counsel had not "seen the report;"

> (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or,
> (2) a rational as well as a factual understanding of the proceedings against him."

8. No psychiatric reports, however, are contained in the record on appeal, and there is no indication by the record that reports were ever filed with the trial court.

9. Article 46.02, supra, § 2, provides:
"(a) The issue of the defendant's incompetency to stand trial shall be determined in advance of the trial on the merits if the court determines there is *evidence to support a finding of incompetency to stand trial* on its own motion or on written motion by the defendant or his counsel filed prior to the date set for trial on the merits asserting that the defendant is incompetent to stand trial.
(b) If during the trial evidence of.the defendant's incompetency is brought to the attention of the court from any source, the court must conduct a hearing out of the presence

(3) that appellant was discharged from the military because of mental illness, and that "during his military service, [he] spent a considerable amount of time in confinement for mental disease or problems;"

(4) that appellant was presently taking 40 milligrams of valium per day;

(5) that a probation report regarding appellant from the State of Virginia reflects that appellant suffered mental instability, depression and was a drug abuser;

(6) that "the psychiatrist who examined [appellant] last week" stated that appellant was a "textbook schizophrenic."

None of these assertions was supported by either documentary evidence or sworn testimony; the psychiatrists mentioned remained nameless. The trial judge denied the motion for a competence hearing "at this time," emphasizing such qualification of the denial.[10]

Article 46.02, § 2(a), supra, provides that, upon written pretrial motion by the defense, the trial court is to determine whether evidence exists which would support a finding that the accused is incompetent to stand trial; if such evidence is extant, the trial court must impanel a jury to resolve the issue, without regard to the existence,

> of the jury to determine whether or not there is *evidence to support a finding of incompetency to stand trial.*"
> See also Section 4, subsections (a) and (c). (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

10. Peripherally salient to this ground is the fact that during trial on the merits, it was the opinion of all psychiatric witnesses that appellant was legally competent to stand trial. The record further reflects that prior to adducing the testimony of Dr. Neil Buie regarding the insanity defense during appellant's case in chief, defense counsel advised the court out of the presence of the jury that he had previously misunderstood Dr. Buie's findings regarding appellant's competence, but now understood it would be Buie's testimony that the appellant was competent to stand trial within the legal meaning of that term.

or for that matter, the clear preponderance, of evidence presented to support a finding of competence. See *Williams v. State*, 543 S.W.2d 385, n. 2 (Tex.Cr.App.1976).

■ In the instant case, the only things which could be characterized as "evidence" presented to the trial judge for his determination were defense counsel's statements that appellant had given conflicting versions of the offense and had expressed a desire to represent himself in the capital murder proceeding. It is implicit in the denial of appellant's motion for a pretrial competency determination by a jury that the trial court found there was *no* "evidence to support a finding of incompetency to stand trial." Thus there was no issue to present to a pretrial jury panel for resolution in this regard.

We agree with the trial court that no evidence was presented which would indicate the necessity of a jury determination of appellant's competence at the time of trial as discussed above, and we so hold. Article 46.02, § 2(a), supra; *Ramsey v. State*, 563 S.W.2d 616 (Tex.Cr.App.1979); *Williams v. State*, supra. This first ground of error is overruled.

■ Next, appellant complains of the failure of the trial court to grant his motion for continuance based upon newly discovered evidence as to the defense of insanity.

As noted *ante*, appellant filed a written notice of intention to raise insanity as a defense on the day this cause was set for trial. A search of the record reveals no written motion for continuance filed on

11. V.T.C.A. Penal Code, § 12.31(b) provides: "Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

12. Article 37.071, V.A.C.C.P., provides: "(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury: (1) whether the conduct of the defendant that caused the death of the deceased was

that day, nor any motion for continuance on the ground now urged at all. The transcription of the court reporter's notes reveals only this statement by defense counsel in this vein:

I have filed defendant's notice of intention to raise evidence of the insanity defense, and I would like the record to reflect that it was filed on this date, June the 12th, 1979. And the reason that it was filed on the date of trial was that it was just learned by defense counsel yesterday that that would be a defense in this cause.

Thus, we find that no motion for continuance was presented to the trial court in any form; accordingly, nothing is presented for review. This ground of error is meritless.

■ By his third ground of error, appellant complains that the trial court erred by excluding venirepersons Mrs. Leon Hlozek and Mr. J. V. Ripple from jury service upon the State's challenges for cause pursuant to V.T.C.A. Penal Code, § 12.31(b).[11] This ground of error is multifarious and thus not in compliance with Article 40.09, § 9, V.A.C. C.P.; however, we proceed to its review in the interest of justice. *Id.*

After the prosecutor explained that under Texas law conviction for a capital offense carries mandatory penalties of life imprisonment or death, that the jury is not "asked to decide specifically which penalty will apply," but that the judge assesses the penalty directed by the answers given to questions submitted to the jury,[12] venirewoman Hlozek was asked:

committed deliberately and with the reasonable expectation that the death of the deceased or another would result; (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
\* \* \* \* \* \*
(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding

With all of this in mind, with your knowledge that the mandatory penalty of life imprisonment or death will apply to this case, affect your deliberations on any issue of fact?

A: Yes.

\* \* \* \* \* \*

Q: All right. Do you have some feelings against the death penalty?

A: Yes.

Q: All right. Are those long-held feelings? Have you felt this way a long time?

A: Always.

The district attorney at this point inquired as to whether Hlozek might "conceive of a murder case under such horrible circumstances" that she could "assess the death penalty if . . . called upon to do it?", to which Hlozek replied, "It would have to be pretty bad." Again, the prosecutor asked whether Hlozek could think of any case in which she could assess death and she replied, "Not right off hand."

The prosecutor continued:

Well, I told you about these two questions. If you answered them both yes, he gets death; if you answer either one no, he gets life. *Would it be your feeling that you would have to answer one of them no so he will get life rather than death?*

A: *Yes. It would.*

At this point, the State interposed challenge to Mrs. Hlozek for cause.

Taking Hlozek on cross voir dire, defense counsel, with the aid of a chalkboard, described the bifurcated trial procedure and then stated:

. . . and then the court will tell you that you are to answer the following two questions truthfully:

\* \* \* Did the person commit the act deliberately?

If you answer that question yes, then you will answer the second question:

on any issue submitted under this article, the court shall sentence the defendant to confine-

Is the person likely to commit the same or similar acts of violence in the future?

\* \* \* \* \* \*

If you answer that question yes, then the court will assess the death penalty. If you answer the question no, then the court will give him life imprisonment. O.K.? Do you understand how it works now?

Now, the question is *can you truthfully answer those two questions?*

The court will tell you that you will have to answer them based upon what the evidence is you hear. *If you hear evidence to indicate to you that the person did the act deliberately, that they are likely to do it again, could you answer both questions truthfully?*

A: I don't know.

Defense counsel explained further to Mrs. Hlozek that the court's instructions would require the jury to base their answers on the evidence adduced at trial and that his intent in interrogating her was to determine whether she could answer the questions "from the evidence that [she would] hear from the stand and not from something else." He then inquired:

In other words, will you take the information that comes from that stand and answer those questions *truthfully to the best of your knowledge?*

A: Yes.

At this point defense counsel declared his opinion that the venirewoman was rehabilitated; however, the trial court sustained the State's challenge for cause, to which appellant voiced exception.

Appellant now contends that Mrs. Hlozek never stated "that she would not be able to follow the Court's charge and the law and answer questions based on the evidence as perceived by her" but that "she merely qualified her ability and predisposition to answer objectively the questions that might be propounded to her."

We first observe that the entire voir dire examination of Mrs. Hlozek is very short;

ment in the Texas Department of Corrections for life."

each of her answers, all of which are set out above, is quite concise. While she first admitted in response to defense counsel that she did not know whether she would answer the punishment questions truthfully "if [she heard] evidence to indicate . . that the person did the act deliberately, [and] that they are likely to do it again," this is the only answer given by her which could be characterized as "equivocating" or "vacillating."

By contrast, Hlozek was positive in her statement that the mandatory penalties would affect her deliberations on issues of fact. Beyond this mere affirmation, Hlozek elucidated, communicating that she had "always" had feelings of opposition to the death penalty which would require her to answer one of those questions "no" so that a death sentence would be avoided.

In *Garcia v. State*, 581 S.W.2d 168 (Tex. Cr.App.1979), the answers given by venirewoman Lucille Jetter, to the effect that she would answer the punishment questions so as to assure a life sentence, were held to constitute "clear" disqualification pursuant to § 12.31(b), supra, notwithstanding some equivocation. Similarly, in *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr.App.1978), venirewoman Irene Hawk was disqualified in spite of her belief in the death penalty "in some cases," when she indicated that she did not believe she could answer the special issues "yes."

Appellant nevertheless argues that Mrs. Hlozek's "yes" answer to his final question regarding her willingness to "take the information that comes from the stand and answer those questions truthfully to the best of [her] knowledge" substantiates her qualification as a juror in a capital case.[13]

In *Hovila v. State*, 562 S.W.2d 243 (Tex. Cr.App.1978), this Court was confronted with a litany of voir dire responses to defense counsel's questions indicating that the prospective jurors would answer the punishment questions "truthfully," notwithstanding their earlier statements, to the prosecutor, that their deliberations on fact issues would be affected by the mandatory penalties to be ultimately imposed. Venireman Glass stated that he believed the death penalty was a proper punishment in some cases and that he would not give untruthful answers; however, he reported that he could not state under oath that the penalty possibilities would not affect his deliberations and explained, " . . . it would certainly affect the way in which I interpreted certain facts coming to me, that is, as I understand it, our job would be to interpret these facts, there's obviously a question about them or there wouldn't be a trial." In a like manner, prospective juror Boyd related her approval of capital punishment, but was unable to state under oath that the possibility of its imposition would not affect her fact deliberations.

Defense counsel on cross voir dire then asked Boyd, " . . . would the mandatory death or life affect you to the extent that you would be *untruthful* in answering the questions?" Boyd replied,

> No, I wouldn't be untruthful, but it would, you know, it would affect me to the point, you know, where I probably would get confused about it, . . . mixed up emotionally.
>
> \* \* \* \* \* \*
>
> It would affect it, but I am not saying that I would tell a story, I mean, you know, do it untruthfully.

This Court reasoned at 247, that prospective juror Boyd was properly excused because,

> Section 12.31(b) does not disqualify prospective jurors on the basis of whether or not they can state under oath they will answer the questions truthfully. This provision disqualified those jurors who cannot state under oath that the mandatory penalty of death or life imprison-

---

13. Intermingled with this contention, and in fact, throughout this multifarious ground of error, is the assertion that the venirepersons excused were qualified jurors under the test enunciated by *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Because of our disposition of this ground of error, address of contentions in this vein will be obviated.

ment would not affect their deliberations on any issue of fact. Prospective juror Boyd forthrightly stated that the possible infliction of the death penalty would confuse her and disturb her emotionally and that, as a result, her deliberations on the fact issues would be affected. The clear implication of her testimony was that she would not be *consciously* deceptive. [Emphasis original].

■ Past decisions which have treated issues similar to the one before us, have, for the most part, neglected to recite in any detail the voir dire responses given by prospective jurors determined to have been properly disqualified under § 12.31(b), supra. But we believe that the crucial consideration in determining the propriety of the trial court's ruling that a venireperson has been so disqualified was correctly stated in *Hughes v. State*, supra, at 861:

> Section 12.31(b) does not disqualify prospective jurors who would find it difficult to impose the death penalty. But *this provision does disqualify those . . . who* cannot state under oath that the mandatory penalty of death or life imprisonment will not affect their deliberations on any issue of fact and, thus, *could not be fair and impartial jurors.*

Accord *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).[14]

■ The ultimate question, then, is whether Mrs. Hlozek's "yes" response to defense counsel's final voir dire question had the effect of illustrating her capacity to be a fair and impartial juror vis a vis her

unequivocal statements which revealed her to be incapable of answering the punishment issues according to the law and evidence because of deep seated, long held opposition to death as a penalty.

We are constrained to conclude that the tentative and qualified wording of defense counsel's question to Mrs. Hlozek—"will you take the information that comes from that stand and answer those questions *truthfully to the best of your knowledge?"*—renders her response thereto fairly useless for purposes of negating the import of her unequivocal admissions that her fact deliberations would be affected by the mandatory penalties. See, e. g., *Bell v. State*, 582 S.W.2d 800 (Tex.Cr.App.1979).[15]

■ Accordingly, in view of the absence of further exploration of Mrs. Hlozek's final response, we hold that the fact that this venirewoman could answer the special issues *truthfully* to the *best of her knowledge* does not demonstrate that her opposition to the extreme penalty of death would be subjugated in her perception and application of the facts during jury deliberations. This concise voir dire examination, when taken as a whole, presents an overall picture of a person whose strong and long held feelings of opposition toward death as a punishment for crime would prevent her from abiding by existing law or considering fairly the facts as adduced. *Lockett v. Ohio*, supra. It is too mechanistic to reason that such a prospective juror is qualified because she would answer the punishment questions truthfully, *to the best of her knowledge*, in

---

**14.** In a context in which the jury serves a fact finding function as opposed to a function of exercising discretion in punishment assessment, the Supreme Court of the United States noted that:

> Each of the excluded veniremen in this case made it 'unmistakenly clear' that they could not be trusted to 'abide by existing law' and 'to follow conscientiously the instructions' of the trial judge. *Boulden v. Holman,* 394 U.S. 478, 484, 89 S.Ct. 1138, 1142, 22 L.Ed.2d 433 (1969).

*Lockett v. Ohio,* supra, 438 U.S. at 596, 98 S.Ct. at 2960.

**15.** In *Bell v. State,* supra, prospective juror Josephine Asbury, after expressing opposition

to capital punishment and admitting such would affect her jury deliberations, was asked by the trial court:

> . . . you would be asked certain other questions and you will know that if those questions are answered one way the Court will have to impose the death penalty, and you will know that if the questions are asked [sic] another way a life sentence will have to be imposed. Now, will that have any effect *on you in determining what the truth is* with respect to the questions which are asked you?

Asbury's affirmative answer to this question was held to have clearly disqualified her.

view of her strong and unequivocal assertions that her objections to the death penalty would compel her to answer one of the questions "no." See and cf. *Smith v. State*, 573 S.W.2d 763 (Tex.Cr.App.1978).[16] No error is shown by the exclusion of Mrs. Hlozek.

■ Appellant also challenges the exclusion for cause of venireman J. V. Ripple on the State's motion. A review of the record before us, however, reveals that at the conclusion of voir dire examination, the State moved to exercise four of seven unused peremptory strikes to remove four prospective jurors, against each of whom a challenge for cause had previously been granted. The prosecutor explained,

At this time, Your Honor, the State would preempt jurors 3, 15, 25 and 34, and would state that under no circumstances would the State take these four jurors.

Venireman Ripple was prospective juror No. 34, and thus, the record reflects that he was ultimately peremptorily challenged. As such, nothing is presented for review.[17] Articles 35.14 and 35.15(a), V.A.C.C.P.

This third ground of error is overruled.

Grounds of error four and five complain of the admission of appellant's written inculpatory statement admitting his commission of the capital murder of Loretta Jones. Appellant asserts both that his right to the assistance of counsel was violated when he was afforded no opportunity to consult with an attorney between the time of his extradition hearing in North Carolina and the

time he signed the statement, and that the confession was obtained without a knowing and intelligent waiver of his Fifth Amendment right to silence due to his being under the influence of drugs at the time. These contentions are without merit.

Consonant with the requirements of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and Article 38.22, V.A.C.C.P., the trial court convened a hearing outside the presence of the jury to determine the admissibility of appellant's inculpatory statement. The salient testimony adduced at that hearing follows:

Texas Ranger Carl Weathers and Detective Gary Quinn of the Bay City Police Department arrived in Carthage, North Carolina where appellant was confined on or about May 3, 1978, in order to escort appellant back to Matagorda County via commercial air. Appellant was warned by each officer before he was taken before a North Carolina magistrate for extradition proceedings. Additionally, appellant was given an opportunity to consult privately with an attorney prior to the hearing, and at that hearing, appellant, after being again advised of his rights, waived extradition in open court.

As the airplane carrying appellant, Quinn and Weathers approached the Atlanta Airport where the three were to change planes, appellant became very agitated and explained that he was afraid of flying. According to the testimony, the weather was bad and the landing at Atlanta was extraordinarily rough. In the airport, appel-

16. The opinion in *Smith v. State*, supra, concluded that a meritorious defense challenge for cause to a prospective juror had been erroneously denied by the trial court and such ruling constituted reversible error. Of all the capital cases decided by this Court to date, *Smith* is the only opinion which reflects the entire voir dire of the venireman whose responses were in issue. A careful reading of venireman Payne's testimony reveals that throughout his voir dire, he was confusing the "first question" with the "guilt phase," and the "second question" with the "punishment phase." This confusion was clearly exacerbated by the trial judge's phraseology in propounding questions to Payne. When Payne stated that he would not assess death as the punishment if the jury had "not

[found the defendant] *guilty of capital murder*," the trial judge denied the challenge for cause, apparently unaware of the ambiguities contained in his own questions to the venireman.

We bring attention to *Smith* to emphasize the danger of seeking only "magic phrases" in voir dire responses on which to base "mechanistic" rulings.

17. Appellant neither objected to this procedure at trial, nor does he complain of it on appeal. Thus, we do not pass on the propriety of a party's exercise of peremptory challenges at the conclusion of individual voir dire in a capital case. See Articles 35.17(2), 35.13, V.A.C.C.P.

lant became weak, explaining that he was quite afraid of getting on another plane; at one point his knees buckled and he almost fell. The officers arranged to have a local law enforcement agency take them and appellant to Grady Hospital [18] where appellant was given a shot to calm him, and the officers were given some pills [19] to give appellant if he became agitated again. Ranger Weathers remembered giving appellant one of the pills later that day. The officers and their charge arrived in Houston late in the evening and drove to Bay City, arriving at 10:00 p. m. Appellant was taken before a Justice of the Peace, was advised of his rights [20] and placed in the city jail for the night.

The next morning at about 9:30 or 10:00, Investigator Jack Brock of the Matagorda County Sheriff's Department interrogated appellant. Appellant, however, told Brock that he did not want to talk to him, that when he got ready to talk, he would tell Weathers and Quinn about the murder because they had been nice to him. According to Brock, he at that time terminated the interview which had lasted 10 or 15 minutes.[21] Sometime thereafter Ranger Weathers took appellant to the Sheriff's office where they met Quinn. Weathers again warned appellant and explained the warnings. Appellant indicated he understood the warnings, did not want a lawyer and was ready to waive his rights. The officers testified that appellant was lucid and did not appear to be under the influence of drugs or alcohol; appellant was not threatened, coerced or denied food, drink or use of the restroom.

At 2:55 p. m. on May 5, 1978, Weathers began typing appellant's account of the offense. The statement was completed by 3:20 p. m., and Weathers read the warning to appellant at the top of the statement form, then gave the statement to appellant who read it. Soon thereafter, the officers took appellant to see a local physician for a ·physical examination. According to both Weathers and Quinn this was done pursuant to standard procedure in order to establish that appellant had not been physically abused in the event such a claim should arise. After the physical was completed, the doctor prescribed 10 milligrams of valium, four times a day for appellant.

█ The thrust of appellant's fourth ground of error is that appellant, as a capital murder defendant, had a *per se* right to have a lawyer appointed for him at the time he was warned by the Justice of the Peace on his arrival in Bay City the night of May 4th. It is uncontroverted, however, that appellant made no request for the appointment of counsel, while indicating he understood it was his right to do so. Under these circumstances, no *per se* right to counsel arises and we so hold. *Corley v. State*, 582 S.W.2d 815 (Tex.Cr.App.1979); *Woodkins v. State*, 542 S.W.2d 855 (Tex.Cr. App.1976).

█ As to appellant's contention that he was so under the influence of drugs that he could not have knowingly waived his right against self-incrimination, we note that the only such evidence came from appellant himself, who asserted that the gram of PCP he claimed to have ingested the previous day constituted an "overdose." Appellant

18. Appellant testified that before landing, he had gone to the restroom because he was "coming apart" and needed drugs. Appellant testified he at that time ingested a gram of PCP, commonly called "angel dust," which he had hidden in his shoe. According to appellant, he fell and hit his head in the Atlanta Airport and was so unsteady on his feet, the pilot of the plane to which the three transferred refused to allow them to board because of appellant's condition. Neither Weathers nor *Quinn could remember whether appellant went* to the restroom before landing, and neither of the officers was asked to confirm or deny ap-

pellant's account of why he was taken to the hospital.

19. The officers testified that they knew neither what kind of injection appellant had received, nor what the pills were. Appellant testified, without elaboration, that the pills were stelazine.

20. See Article 15.17, V.A.C.C.P.

21. Investigator Brock did not testify at the *Jackson v. Denno* hearing, but gave this testimony at trial on the merits.

testified that the effects of a "normal" dosage of PCP would continue for 24 to 48 hours.

■ At a hearing on the voluntariness of a confession, the trial court is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Faulder v. State* (Tex.Cr.App., No. 60,554, delivered February 6, 1980); *Burks v. State,* 583 S.W.2d 389 (Tex.Cr.App.1979); *Hughes v. State,*562 S.W.2d 857 (Tex.Cr.App.1978). Here, the trial court resolved the issues of fact against appellant, and we hold that the trial court's findings are well supported by the evidence adduced at the hearing, and the totality of the circumstances they present.[22]

No error attended the admission into evidence of appellant's written inculpatory statement; grounds of error four and five are overruled.

Appellant's sixth ground of error complains of two statements made by the prosecutor during closing arguments at the guilt-innocence phase of trial which improperly interjected matters regarding the death penalty. Specifically, appellant complains of the following arguments by the district attorney:

To be truthful with you, practically everything going through my mind right now has to do with punishment, because I don't think we need anything on this area of guilt.

\* \* \* \* \* \*

Write in the word 'sane,' have your foreman sign it, and then on the last page, we have found him sane and we find him guilty and have your foreman sign that, return it into this court and then we will go into what really this case is all about: punishment.

Mr. Manske: Your Honor, I object to that. \* \* \* Object to any discussion about punishment at this phase.

The Court: I overrule it.

■ Initially we note that no objection was voiced to the first statement com-

plained of, recited above. Thus, nothing is presented for review. Notwithstanding this failure to preserve such complaint, our reading of the arguments as a whole convinces us that these comments were clearly invited by the argument of defense counsel, a sampling of which follows:

It's not a question of did somebody fail to maintain a proper lookout and hit someone else and they have got a whiplash; it's a question of life or death.

\* \* \* \* \* \*

Well, let's just go ahead folks. You find him guilty and let's kill him, because they have to have your help to kill somebody. That is why you are here, as a buffer.

\* \* \* \* \* \*

We have had Mr. Vigneault in our hands—his life for sometime, and although we are not talking at this point on an issue of life or death as to what you are going to vote, certainly it has a bearing.

\* \* \* \* \* \*

This poor man is sick; he is ill; he needs help, and he will get help, but he should not be put to death, not because of what he did, when he is incapable of controlling his actions.

Under these circumstances, we cannot say that the prosecutor's remarks complained of here constituted error. *Thomas v. State,* 578 S.W.2d 691 (Tex.Cr.App.1979); *Hammett v. State,* 578 S.W.2d 699 (Tex.Cr.App.1979); *Mays v. State,* 563 S.W.2d 260 (Tex.Cr.App.1978); *Stearn v. State,* 487 S.W.2d 734 (Tex.Cr.App.1972). This sixth ground of error is without merit.

Finally, appellant complains of the submission of the two special issues dictated by Article 37.071, supra, because "the pleadings of the State (the indictment) did not in any way raise the two issues that were submitted to [the] jury [in the] punishment charge." It appears to be appellant's position that procedures for special issue submission do not exist in the body of Texas

22. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

criminal law, and accordingly, such submission must be governed by civil law which dictates that only issues raised by pleadings of the parties may be submitted to the fact finders. Appellant cites for this proposition Rules 67 and 277, Texas Rules of Civil Procedure.

We first observe that appellant is incorrect in asserting that special issue submission is alien to our criminal procedure; Article 37.071, supra, subsections (b) through (e) provide for specific procedures governing special issue submission in capital cases. Furthermore, the fact that the issues to be submitted to the jury are in every capital case identical and wholly independent of the varying fact situations which may come to trial [23] places the capital defendant in a substantially different posture as regards notice thereof, from that of a civil litigant.

We accordingly hold that appellant was not denied notice that the special issues prescribed by Article 37.071(b), supra, would be submitted to the jury at the punishment phase of his trial. Appellant's seventh ground of error is without merit.

In determining that the Texas capital murder procedure is constitutionally viable on its face, a majority of the Supreme Court of the United States concluded:

> By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution. *Furman v. Georgia*, 408 U.S. at 310, 92 S.Ct., at 2762 (Stewart, J., concurring). Accordingly, the judgment of the Texas Court of Criminal Appeals is af· firmed.

*Jurek v. Texas*, 428 U.S. 262, 276–277, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

Recognizing our austere responsibility in assuring the evenhanded application of the ultimate punishment, we have carefully reviewed the entire record before this Court on appeal and are convinced that appellant's trial was conducted in a manner wholly consistent with the dictates of due process of law. Though not at the behest of appellant, we have independently reviewed the evidence for its sufficiency to support the jury's affirmative answers to the punishment issues submitted.

The evidence revealed that this 29 year old appellant had been consistently involved in criminal, as well as other violent activity since the age of 16 when he quit school and left home, probably due to heavy use of heroin, "speed," "LSD" and "angel dust" which began around that time. When appellant was 16, he intentionally attempted to "roll" his car "almost every week," and once, with another person, cut off two fingers of a friend who wanted to avoid military service. At the age of 18, appellant shot himself in the foot for $10.00, and shot a girl in the face with a .22 caliber blank. These incidences were related by appellant to illustrate his assertion to Dr. Buie that "death was a game to him."

At the age of 19, appellant joined the Air Force and his drug abuse diminished, but within five months he was again using any drug which "floated by." After going AWOL, appellant was arrested in possession of drugs and incarcerated for eight months. After his release, he became involved with a married woman and, upon confronting her husband one day, assaulted him with a .45 caliber pistol. Thereafter, appellant "rounded up all the pills he could find" and attempted suicide. He was placed under psychiatric care, but soon received a general discharge from the Air Force; he was, however, characterized on discharge as a "paranoid personality, chronic, severe." Also during this time, appellant pulled a knife on a girl, cut her hand and some fingers; the record indicates that for this, appellant was charged with maiming.

---

**23.** The only variation, of course, being when special issue number three is inapplicable to the case; in that event, such third issue is deleted from the charge completely.

In 1973, when appellant was 22 years old, he met a 16 year old girl whom he made pregnant. The two were married and had a baby girl, but in 1974, they separated. Appellant was soon arrested for sodomy, forcibly committed upon a teenage girl. He was briefly incarcerated in a mental hospital and thereafter imprisoned for a year and one half. It was at this point that appellant became "plagued with homicidal thoughts," particularly with regard to his wife.

After his release from prison, he met Noreen Keith, to whom he became engaged. Keith testified that the day after she had met appellant, she saw him walking through the neighborhood and called "hey boy," whereupon appellant wheeled around and picked up a rock, as if to throw it. Keith yelled again, afraid he would hit her, and on recognizing her, appellant dropped the rock. Keith related that sometimes when appellant stayed with her, he would jump out of bed in the middle of the night and run outside "with a gun in his hand." One night as Keith returned to bed from the bathroom, appellant pulled a gun on her. Keith further testified that appellant was often unable to "cope" in everyday situations, "was very violent a lot" and had a severe "hatred in his heart" toward his ex-wife.

Kim Thompson testified that he was afraid of appellant when he was drunk and described him as "wild and dangerous." When appellant portrayed the murder of Loretta Jones to Thompson and Dwane Rickman, he told them "[they'd] better help him or he'd get [them] one way or another." Before appellant left town he threatened to kill Thompson and Rickman if they "narked" on him.

Dr. Neil Buie testified that he believed much of appellant's "paranoia" was due to his chronic abuse of methamphetamine, commonly called "speed." It was Buie's opinion that appellant "is capable of killing again" and would be a danger to himself and others. Dr. Martin Blindler, also a psychiatrist, opined that appellant's ability to control his acts is significantly impaired, and impaired to a far greater degree than that of the average person. There was also testimony that in the month preceding the capital murder, appellant almost attacked a young girl he met in a bar in Bay City.

In view of this evidence of appellant's repeated violent conduct over a period of 14 years, coupled with the facts of the instant case, including the calculated manner in which appellant ultimately murdered his victim, this Court cannot say that the jury was unjustified in reaching the verdict before us.

Satisfied that our capital murder provisions have been constitutionally applied in this case, we affirm the judgment.