**Jimmy Loyd MEAD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68025.**

Court of Criminal Appeals of Texas,
En Banc.

Sept. 14, 1983.

Appeal from Criminal District Court No. 2, Tarrant County; Howard M. Fender, Judge.

Allan K. Butcher, Jeff Kearney, Fort Worth, for appellant.

Tim Curry, Dist. Atty., C. Chris Marshall, Howard Borg and Mike Worley, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

OPINION TO THE DENIAL OF STATE'S SECOND MOTION FOR REHEARING WITHOUT WRITTEN OPINION

CAMPBELL, Judge, dissenting.

To the majority's denial of the State's second motion for rehearing without written opinion, I respectfully dissent.

On original submission, this Court determined that a venire-person, Arturo Cabriales Espindola, was improperly excused by the trial court according to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and its progeny, and thereby reversed the appellant's conviction. See *Mead v. State,* 645 S.W.2d 279 (Tex.Cr. App.1983). On January 27, 1983, the State filed a motion for leave to file the State's motion for rehearing, which this Court denied without written opinion. The State then filed a second motion for leave to file a motion for rehearing on February 18, 1983, which a majority of this Court voted to grant on March 23, 1983. Although I am mindful of the mandates required by Tex. Cr.App. Rule 309 and 310, I further note the express statutory authority given to this Court by Tex.Cr.App. Rule 4, which states:

"In the interest of expediting a decision or for other good cause shown, a court of appeals or the Court of Criminal Appeals may, except as otherwise provided in these rules, suspend the requirements or provisions of any of these rules in a particular case on application of a party or *on its own motion*[1] and may order proceedings in accordance with its discretion. Provided, however, that nothing in this rule shall be construed to allow any court to suspend the requirements or provisions of the Code of Criminal Procedure."

Whether we consider this matter on our own motion or on the second motion for rehearing filed by the State is of no moment, because I believe a majority of this Court, by denying the State's second motion for rehearing without written opinion, has done substantial damage to the teachings of several of the opinions of this Court, and by sanctioning the opinion on original submission, places an interpretation upon *Witherspoon* that was never contemplated by the majority of the Supreme Court of the United States when that decision was handed down.

1. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

The appellant contends that the trial court erred by excluding venirepersons June Donnelly and Arturo Espindola from jury service upon the state's challenge for cause when neither venireperson was disqualified under the rule set forth in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Prosecutor Mike Worley investigated at length Mrs. Donnelly's views on the death penalty and how her views would influence her service as a juror. Following are pertinent parts of her voir dire:

"Q. [PROSECUTOR]: Have you had an opportunity to think about your feelings on the death penalty or capital punishment since you were called as a juror in the trial of this case?

"A. Yes.

"Q. What are your thoughts about?

"A. Well, I was in Florida last month when Spenkelink was executed, and at that time, we discussed at length the pros and cons.

"Q. You say 'we'?

"A. My husband and I. Then on the way back, we stopped at his brothers in Mississippi and we discussed it again, and it seems ironic because when I got home, I had this jury summons and I thought, well, I'll be down there a day or two—yes, I have thought a great deal about it.

"Q. Did you reach any conclusion?

"A. Yes.

"Q. What was the conclusion?

"A. I couldn't vote for a death penalty.

"Q. All right. You understand that I'm not here to change your ideas or argue with you about any particular thing. It's important now that we know how you feel about these things. I take it that you put quite a bit of thought into this before you arrived at the decision that you couldn't vote for a death penalty?

"A. Oh, a great deal. As a matter of fact, I had two nightmares.

"Q. This wasn't a snap decision?

"A. No."

"* * *

"Q. Is this feeling on your part that you couldn't participate in a death sentence, resulting in our state by lethal injection, so strong and so firm that you would automatically vote against the imposition of the death penalty regardless of what the facts in the case might show?

"A. I could vote guilty, but I would not want to be put in a position where I would have to say this man must die."

"* * *

"Q. ... And, I need to know from you whether you could answer those questions fairly according to the facts with the knowledge that if you answered them in a certain way the death penalty would be imposed as a result of your verdict. Do you feel like you could not do that?

"A. I would be truthful, but I can't say truthfully that I want a death penalty. I know you have to go by the law but it seems there are so many inconsistencies in murder cases."

"* * *

"Q. Am I correct in stating that your convictions against the death penalty is so strong and so deep that you would not let anybody talk you out of it?

"A. Yes, it is that strong.

"Q. And, since it's that strong and that deep, can I take it that you cannot imagine any set of facts so horrible that you could vote for the imposition of the death sentence?

"A. *I can only remember one where I could have voted for the death penalty.*"

"* * *

"Q. If it came your—I understand that you feel that you are qualified and I'm sure you are to sit and determine whether the defendant in a capital murder case is guilty or innocent of the charge. Is that your feeling?

"A. Yes.

"Q. But, you understand that in the event that you find a defendant guilty of capital murder, then it becomes the

jury's duty to pass upon the punishment to be imposed?

"A. And, that's where I would bog down.

"Q. And, that's why I have to ask you—if you can—I'm going to try to ask you yes or no questions and if you can answer it yes or no, please do so. I'm not asking you to do something that you can't do. The question I have for you is this feeling on your part so firm that you would automatically vote against the imposition of the death penalty regardless of what the facts of the case might show.

"A. Yes."

Prosecutor Worley then explained to venireperson Donnelly the punishment stage procedures in Texas capital murder trials and the special questions submitted to the jury. The voir dire of Mrs. Donnelly by the State ended on the following colloquy:

"Q. You said that the effect of your answers that either life in the penitentiary or the Court would impose the death sentence would affect you on how you would answer these questions of fact, and I take it that when you say that it would affect you that you mean that you would automatically not—no matter what the evidence showed, you would not answer all of the questions yes because you know if you answered all of the questions yes, the death penalty would be imposed.

"A. I could not tell someone that they have to die."

" * * *

"Q. ... I take it from what you told me a minute ago, you would automatically—you could not answer all of those questions yes knowing with the knowledge, and you have that knowledge, by answering those questions yes, the Court would impose the death sentence?

"A. Yes.

"Q. That's correct?

"A. Yes."

At that time defense counsel Kearney requested that he be allowed to take Mrs.

Donnelly on voir dire. Following are the pertinent parts of the defense voir dire:

"Q. [DEFENSE COUNSEL]: Can you conceive in your mind a set of circumstances, facts that are so horrible if proven to you beyond a reasonable doubt that you could, if the evidence convinced you that you could consider the death penalty—I think you said there is *one circumstance that you could consider the death penalty?*

"A. Yes.

"Q. So, you can conceive a set of circumstances in your mind where if all of the evidence was there and you were convinced beyond a reasonable doubt, you could vote for the death penalty?

"A. *There were children involved in this case.*

"Q. We can't limit it to any particular thing. Whatever that you can conceive in your mind of a set of circumstances. It could be anything, okay? *There is a set of circumstances that you can visualize in your mind where you can vote for the death penalty, right?*

"A. *I think only if there were children involved.*

"THE COURT: Just a moment. Let's not get into what would be involved. The question must be answered. As I told you, we are speaking abstractly of the law. You can work this out in your mind anyway you want to, but the question you must answer is the question that he asked you that is can you in your mind think of a set of circumstances or facts on which you could sit as a juror and vote to impose the death penalty? You think that out as much as you want to. But, that's the question you must answer. Not what are the circumstances, *but are there circumstances where you could sit as a juror and vote to impose the death penalty.*

"A. *No.*"

" * * *

"Q. The Judge's question to you said could you vote for—obviously, you

don't know whether you could vote for it, but my question—

"A. If I have to put yes or no, I would say no."

" * * *

"Q. We are not asking you how you would vote in this case, you understand, because you have not heard the facts?

"A. You mean in any case?

"Q. Right. I'm talking about can you conceive in your mind a set of circumstances—now, a minute ago you told me that you could. A minute ago you told me that you could conceive in your mind, and you thought of one case where you could.

"A. But, if you require either a yes or no answer, then I would have to say no.

"Q. Did you earlier say that you could think of a set of circumstances—you said you thought of one, is that correct?

"A. Yes, but if it got down to the nitty-gritty, I don't know if I could or not, even in that case."

" * * *

"Q. You just answer yes or no to certain questions that are given to you. And, my question to you is, that if the State has proved a case beyond a reasonable doubt and they prove to you that those answers are yes and they have removed every doubt in your mind, reasonable doubt in you mind, that the answers are yes, and you've convinced in your mind from all of the evidence and all the circumstances and all the facts that the answer should be yes, could you answer the questions yes?

"A. *I would not—I could not give a death penalty to anyone.*"

Shortly after this response to the defense counsel's question, the trial court sustained the state's challenge for cause. There was no request for further questioning by the defense.

It is clear from the foregoing transcription that Mrs. Donnelly made it unmistakenly clear that she would automatically vote against the death penalty regardless of the facts of the case. Although she did state that she could be fair on the issue of guilt, she nevertheless indicated that she could not be impartial on the punishment issues.

The appellant argues that Donnelly became an equivocating juror during her examination by the defense. Although she did say that she might be able to consider imposing the death penalty in a capital murder case involving children, she ultimately answered that even in that case she did not know if she could vote for the death penalty or not. When Defense Counsel Kearney explained to her that as a juror she would not vote for life imprisonment or death, but rather that she would answer "yes" or "no" to the special questions, Mrs. Donnelly insisted that, nonetheless, she could not give the death penalty to anyone.

This Court has held that in the area of equivocating jurors the rule set forth in *Witherspoon,* supra, does not require specific formalized answers. *Hernandez v. State,* 643 S.W.2d 397 (Tex.Cr.App.1982); *Tezeno v. State,* 484 S.W.2d 374 (Tex.Cr.App.1972). The thrust of Mrs. Donnelly's voir dire examination as a whole reveals her to be irrevocably committed against the imposition of the death penalty. The voir dire of Mrs. Donnelly actually was not so equivocal as to persuade me to label her a classic equivocating juror.[2] Having carefully reviewed the record, I conclude that the trial court's exclusion of Mrs. Donnelly was not inconsistent with the rule set forth in Witherspoon: her answers reflected that she would have been irrevocably committed to vote against the imposition of the death penalty regardless of the facts and circumstances that might emerge during trial. *Witherspoon,* 88 S.Ct. at 1777, n. 1.

After general questioning by prosecutor Borg, the following colloquy occurred re-

2. See, e.g., the voir dire examination of venireperson Smith in *Hernandez,* supra. Unlike Mrs. Donnelly, Mrs. Smith repeatedly answered that she "honestly didn't know" how she felt.

garding Mr. Espindola's views on the death penalty:

"Q. In a capital murder case in Texas, there are only two potential punishments, life in the penitentiary and death by lethal injection. In all other criminal cases in Texas, a jury that decides on punishment is given a range of punishment to pick from, because all cases are different. The legislature sets a range of years in the penitentiary that the jury is to look and pick the appropriate punishment if they find the man guilty. And, in a capital case, like I say, it differs because there are only two potential punishments, life in the penitentiary or death by lethal injection. The Judge asked you, I believe, when you were all in here together, that—asked you to think about capital punishment. Have you had an opportunity to do that?

"A. Yes, sir.

"Q. What are your feelings about it?

"A. I have been going through this over in my mind and I really don't believe in life sentences. I don't believe in the other.

"Q. Is this—you don't believe that you could be part of a jury that would inflict death on a person by lethal injection?

"A. Yes, I don't believe in that, sir.

"Q. And, as I say, we are here to find out what your beliefs are, not trying to get you to say what someone might want you to say or anything like that. You agree that people have a duty to serve on a jury?

"A. I do.

"Q. Do you also agree that if a person has personal beliefs in a particular case that would interfere with that jury service? They have the duty to tell the people about it and not serve if they couldn't serve and violate their own beliefs?

"A. Well, I wouldn't like to violate my own beliefs. *But, I still say I do not believe in the death penalty.*

" * * * *

"Q. Is this belief—you don't believe in the death sentence—as your being part of the jury that would have to inflict the death penalty?

"A. *Sir, I don't believe in the death penalty.*

"Q. *At all?*

"A. *At all.*

"Q. Is this—this is a deep-seated and firm conviction on your part, I take it?

"A. Yes, I was—ever since we got the briefing a week ago, I have been going through it in my mind and I just came to that conclusion, sir.

"Q. *And, you could not vote for the death penalty in a case no matter how horrible the facts were?*

"A. *No, sir, I could not vote for the death penalty.*

"Q. I will go into the procedure a little more, but is this—because of this belief, you are irrevocably committed before the trial begins to vote against the death penalty regardless of the facts and circumstances because of your belief?

"A. That's right.

" * * * *

"Q. Your beliefs are such that in a capital murder case, one where the punishment would be death by lethal injection, that you might have to tell the court that you could not take the oath to follow the law where the law might require you to give the death sentence by lethal injection, is that right?

"A. I would like to clarify that.

"Q. First of all, I'm not trying to argue with your beliefs. I'm just trying to get them down—you could not sit on a jury and decide the facts knowing that the verdict would result in the death of an individual, if you had to decide a certain way, is that right?

"A. *I would not know what the verdict would be, sir, but I still do not believe in the death penalty.*

"Q. And, would this belief prevent you from objectively looking at the facts? Would it affect your deliberations and

have a profound effect on your deliberations and prevent you from deciding these facts?

"A. I need more clarification on that, sir."

At this point Mr. Borg explained in detail the capital sentencing procedures in Texas. At the conclusion of this explanation he asked Mr. Espindola if the procedures were clear and the venireman answered that they were.

Prosecutor Borg continued with the following:

"Q. Because you don't believe in the death penalty, *then would you automatically vote no to these questions no matter what the facts were to keep the man from getting a death sentence?*

"A. *I imagine I would.*

"Q. *All right. Because of your beliefs?*

"A. *Yes, because of my beliefs.*

"Q. And, your belief would have a—would enter into these deliberations because you just don't believe in it, and you could not vote yes and you would vote no, is that right?

"A. That's right.

" * * * "

At the conclusion of the State's voir dire of Mr. Espindola, defense counsel Kearney requested permission to take him on voir dire. The following voir dire took place:

"Q. Sir, you understand that before you would even be faced with these questions, you first would have to be part of a jury that found a person guilty beyond any reasonable doubt of capital murder. You understand that?

"A. I understand that.

"Q. And, do you feel like you understand what the questions are that he read to you?

"A. Yes.

"Q. First of all, let me ask you if you feel like that you could answer those questions—first of all, before we get into what effect it would have on you, do you feel like you are the kind of person that could listen to the evidence and answer questions proposed to you?

"A. Yes.

"Q. You wouldn't have any problem with answering questions?

"A. No, I wouldn't

"[PROSECUTOR]: Objection—the question is not framed that these questions are the punishment questions that could lead to the—he's just talking about questions in general and this is beyond the scope of the voir dire.

"THE COURT: I'll overrule the objection.

"Q. [DEFENSE COUNSEL]: Second, you understand that if you are on a jury that that—that you would have to give a true verdict according to the law and evidence. You understand that?

"A. Yes, I understand that.

"Q. And, if the State—the next thing I'll ask you before we get the effect is I will ask you—assume, if you will with me, that the prosecutors prove to you beyond any reasonable doubt that the evidence is there and the questions in your mind, you're convinced beyond any reasonable doubt the questions should be answered yes, okay?

"A. Yes, I understand.

"Q. And, you're convinced of that in your mind beyond any reasonable doubt that the answers should be yes, okay?

"A. Yes, I understand.

"Q. And, *would you be untruthful in your answer intentionally and would you just deliberately answer the question untruthful*—untruthfully or would you answer the question according to what evidence showed, according to your oath as a juror? *Would you just intentionally and deliberately answer the question untruthfully?*

"A. No, I would not.

"[PROSECUTOR]: Object to this. It's not phrased in that—what the effect of his answer would be, the death sentence.

"THE COURT: I'll overrule the objection.

"Q. [DEFENSE COUNSEL]: So, you wouldn't answer it untruthfully?

"A. I would not answer untruthfully, no way.

"Q. So, if you were faced with—the questions that the prosecutor read to you over here, and you either had to answer the questions yes or no, and if you felt in your mind that the answers should be yes, and they have proved that to you beyond any reasonable doubt, and you're required to give a *true answer* to the questions asked of you, okay?

"A. Okay.

"Q. Would you, simply because you knew that the effect of your answer would be, simply for that reason, *would you deliberately answer those questions untruthful just because you knew what the effect of your answers would be?*

"A. I said before that I wouldn't answer untruthfully.

"[PROSECUTOR]: Your Honor, we're going to object to the question. It assumes that one, that the venireman won't answer a question—we object; it's repetitive. The proper question would be could he answer the question yes if he found beyond a reasonable doubt that should be the answer, not whether he would automatically forswear himself. I don't think the juror should be asked to forswear himself.

"THE COURT: I'll sustain the objection.

"Q. Could you—we understand that all people have feelings about the death penalty one way or the other. Could you set those feelings aside and if the Court gave you two or three questions to answer, and you just had to answer them yes or no according to what the evidence is, okay?

"A. Okay.

"Q. And, could you set those feelings aside and look at the evidence if the Court instructed you to and look at the evidence and answer the questions *truthfully* based on the evidence? Could you do that?

"A. I could answer the questions truthfully. *But, I could not put my feelings aside the way that I feel.*

"Q. Well, if you have got those feelings that's something that everybody has, but when it comes down to answering the questions yes or answering the questions no, and you felt that the prosecutors proved to you beyond any reasonable doubt in your mind that the answers to the questions should be yes, okay?

"A. I understand.

"Q. Would you answer the questions yes?

"A. Yes, I would.

"Q. And, if they didn't prove to you that the answers should be yes beyond any reasonable doubt, would you answer the questions no?

"A. That's right."

The defense then submitted Mr. Espindola to the court as a qualified juror. The court, however, sustained the State's challenge to the venireman and he was excused.

A review of venireman Espindola's initial testimony unambiguously reveals that he could never answer the special questions in such a way that would result in the assessment of the death penalty. While Espindola did admit in response to defense questioning that he could answer truthfully, the statement was made only after defense counsel had asked him if he would "intentionally and deliberately answer the question untruthfully." The appellant argues, however, that Espindola's "yes" answer to this final questioning regarding the venireperson's truthfulness in answering the special questions demonstrates his qualification as a juror under the test set forth in *Witherspoon,* supra. I cannot agree with this assertion.

The question of whether a venireperson's "yes" answer to this defense voir dire question will sufficiently rehabilitate the juror was addressed by this court in *Vigneault v. State,* 600 S.W.2d 318 (Tex.Cr.App.1980). In that case the venireperson had testified

that she could not think of any case in which she could assess the death penalty, that she would have to answer one of the special questions "no" so that the defendant would get a life sentence, and that her deliberations on issues of fact would be affected by her knowledge that the mandatory penalty of death or life imprisonment would apply to the case. Taking that venireperson on voir dire, the defense attorney then explained the special question procedure and elicited the response, "I don't know," to his question, "[C]ould you answer both questions truthfully?" The following colloquy then occurred:

> "Q. [PROSECUTOR]: In other words, will you take the information that comes from the stand and answer those questions truthfully to the best of your knowledge?
>
> "A. Yes."

*Vigneault v. State,* 600 S.W.2d at 324.

In holding that the venireperson was properly excused on the State's challenge for cause, Judge Clinton wrote:

> "The ultimate question, then, is whether Mrs. Hlozek's 'yes' response to defense counsel's final voir dire question had the effect of illustrating her capacity to be a fair and impartial juror vis a vis her unequivocal statements which revealed her to be incapable of answering the punishment issues according to the law and evidence because of deep seated, long held opposition to death as a penalty.
>
> "We are constrained to conclude that the tentative and qualified wording of defense counsel's question to Mrs. Hlozek —'will you take the information that comes from that stand and answer those questions *truthfully to the best of your knowledge?*—renders her response thereto fairly useless for purposes of negating the import of her unequivocal admissions that her fact deliberations would be affected by the mandatory penalties. See e.g., *Bell v. State,* 582 S.W.2d 800 (Tex. Cr.App.1979).
>
> "Accordingly, in view of the absence of further exploration of Mrs. Hlozek's final response, we hold that the fact that this venirewoman could answer the special issues *truthfully* to the *best of her knowledge* does not demonstrate that her opposition to the extreme penalty of death would be subjugated in her perception and application of the facts during jury deliberations. This concise voir dire examination, when taken as a whole, presents an overall picture of a person whose strong and long held feelings of opposition toward death as a punishment for crime would prevent her from abiding by existing law or considering fairly the facts adduced. *Lockett v. Ohio,* supra. It is too mechanistic to reason that such a prospective juror is qualified because she would answer the punishment questions truthfully, *to the best of her knowledge,* in view of her strong and unequivocal assertions that her objections to the death penalty would compel her to answer one of the questions 'no.' See and cf. *Smith v. State,* 573 S.W.2d 763 (Tex.Cr.App. 1978). No error is shown by the exclusion of Mrs. Hlozek." [Emphasis in original.]

This Court similarly held in *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979), cert. den. 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980) that a capital venireperson could successfully be challenged for cause, although on defense voir dire he answered that he could be truthful in answering the special questions on punishment. That venireperson had stated in response to the prosecutor's questions that he would automatically vote against the imposition of the death penalty no matter what evidence the trial revealed and that he could not think of any circumstances under which he could possibly vote for the death penalty. Judge W.C. Davis, writing for the majority, stated:

> "Venireman Wells clearly and unambiguously expressed opposition to the death penalty. His responses to questions asked of him in voir dire reveal that he opposed the death penalty to the extent that he would vote against death as a penalty, regardless of the facts in the case. Such deep seated and unyielding

resolve to vote against the death penalty brought Wells within the narrow classification of veniremen discussed in *Witherspoon.* The fact that Wells stated that he could truthfully answer the special issues submitted at the punishment hearing pursuant to Article 37.071 is not dispositive of appellant's claim. Here, venireman Wells took an open and unambiguous position against the infliction of death as a penalty. He was not excused in violation of *Witherspoon.*"

A single promise to be truthful in answering the special questions on punishment does not automatically qualify a venireperson to serve on a capital jury. Asking a venireperson if he will violate his oath has already been held by this Court to be of no use in determining that prospective juror's qualification. See *Vanderbilt v. State,* 629 S.W.2d 709 (Tex.Cr.App.1981), cert. den. 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982); *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.App.1981), cert. den. 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982).

Because of the majority holding in denying the State's second motion for rehearing without written opinion today, it is my sincere belief that the discretion of trial judges across this state in excusing potential venirepersons under *Witherspoon* has been seriously eroded, and the applicable portions of the decisions in *Vanderbilt,* supra, *O'Bryan,* supra, *Vigneault,* supra, and *Williams,* supra, have been cast aside and conveniently ignored. As was so succintly put by the majority of this Court in *Tezeno v. State,* 484 S.W.2d 374 (Tex.Cr.App.1972):

"We cannot believe that *Witherspoon v. Illinois,* supra, requires certain formal answers and none other. We surely feel the test of Witherspoon is 'not to be applied with hypertechnical and archaic approach of a nineteenth pleading book, but with realism and rationality.'" Ibid at 383, (quoting from *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469.)"

Further, in *Hughes v. State,* 563 S.W.2d 581 (Tex.Cr.App.1978), cert. den. 440 U.S. 950,

99 S.Ct. 1432, 59 L.Ed.2d 640, a majority of this Court opined:

"We must be mindful that where we only have a cold record before us the trial judge in passing on the answers of the 'equivocating venireman' has the opportunity to observe the tone of voice and demeanor of the prospective juror in determining the precise meaning intended."

Because a majority of this Court has seriously deviated from these well reasoned decisions, and because prospective jurors in capital cases will be submerged in a sea of meaningless semantics by opposing lawyers under the guise of "rehabilitation," and because the trial judge has been relegated to the role of impotent bystander, I dissent.

TOM G. DAVIS, W.C. DAVIS and McCORMICK, JJ., concur.