Ex parte Jerry McReed PATTERSON.

No. 69813.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 21, 1987.

Jerry McReed Patterson, pro se.

Robert Huttash, State's Atty. and Julie B. Pollock, Asst. State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Before us in this application for writ of habeas corpus filed pursuant to Article 11.-07, V.A.C.C.P., is a question expressly left open in *Polk v. State*, 693 S.W.2d 391 (Tex. Cr.App.1985), *viz:* what notice, if any, must appear in an indictment to support submission of a special issue to the jury as to whether a deadly weapon was used or exhibited during the commission of the alleged offense.

In a two paragraph indictment applicant was charged with the murder of Junior Aaron Newton, "by stabbing him with a knife," in the first paragraph, V.T.C.A. Penal Code, § 19.02(a)(1), and, in paragraph two, with "commit[ting] an act clearly dangerous to human life, namely stabbing him with a knife," and thereby causing his death, § 19.02(a)(2), supra. The indictment

did not expressly allege the knife was a deadly weapon; nor is a knife a deadly weapon *per se*. *Polk,* supra; *Hawkins v. State,* 605 S.W.2d 586 (Tex.Cr.App.1980). In its verdict the jury found applicant guilty of murder under the second paragraph.

Also in its verdict at the conclusion of the guilt/innocence stage, apparently in response to a special issue submitted in the court's charge, the jury expressly found "beyond a reasonable doubt that [applicant] did use a deadly weapon, a knife, that in the manner of its use was capable of causing death or serious bodily injury." V.T.C.A. Penal Code, § 1.07(11)(B). Obviously the jury's affirmative response to the special issue constituted an "affirmative finding" under Article 42.12, then § 3f(a)(2), see now § 3g(a)(2), and it is reflected as such in the judgment of conviction. Consequently applicant is subject to the provision of what is now Article 42.18, § 8(b), V.A.C.C.P., formerly Article 42.12, § 15(b), V.A.C.C.P., mandating that "he is not eligible for release on parole until his actual calendar time served, *without consideration of good conduct time,*[1] equals one-third of the maximum sentence...." Applicant now asserts that both due process and due course of law require "notice" be given in the indictment that the State intends to obtain such an affirmative finding by way of a special issue submitted to the jury.

### I.

In footnote four of his majority opinion in *Polk*, at 396, Judge Miller observed:

"... [t]he corpus of what we are dealing with is *eligibility for parole,* not what the penalty range or sentence will be. Though not raised in this case, the 'notice' requirement of the due process clause of both the 5th and 14th Amendments of the U.S. Constitution and the due course of law clause in Art. 1, § 19 of the Texas Constitution must be examined in that light when properly before us."[2]

---

**1.** All emphasis supplied unless otherwise indicated.

**2.** Emphasis in the original.

Following this cue, the State Prosecuting Attorney responds to the present application by asserting that good conduct time affects only a penitentiary inmate's *eligibility* for parole, see Article 6181–1, V.A. C.S., that under Texas law applicant is afforded no more than a unilateral expectation of parole, and that therefore no liberty interest under either constitution adheres in the accrual of good conduct time. Absent a liberty interest, maintains the State, no process or course of law whatsoever is due. The State relies principally upon *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), and *Williams v. Briscoe,* 641 F.2d 274 (CA5 1981).

In our view, in order to fully evaluate the Fourteenth Amendment liberty interest asserted in this cause, it is also necessary to consider the applicability of *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and other related Supreme Court decisions, to the present circumstances.

*Morrissey v. Brewer,* supra, presented what was treated as a two part question of whether, and if so, to what extent a parolee was entitled to due process prior to the revocation of his parole. There the Supreme Court opined:

"Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.' *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 95 L.Ed. 817, 852, 71 S.Ct. 624 (1954) (Frankfurter, J., concurring), quoted in *Goldberg v. Kelly,* 397 U.S. 254, 263, 25 L.Ed.2d 287, 296, 90 S.Ct. 1011 (1970). The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one

within the contemplation of the 'liberty or property' language of the Fourteenth Amendment. *Fuentes v. Shevin,* 407 U.S. 67, 32 L.Ed.2d 556, 92 S.Ct. 1983 (1972). Once it is determined that due process applies, the question remains what process is due."

408 U.S. 481, 92 S.Ct. 2600, 33 L.Ed.2d 494. After analyzing "the nature of a parolee's interest in continued liberty," the Court concluded:

"... that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others."

408 U.S. at 482, 92 S.Ct. at 2601, 33 L.Ed.2d at 495. Having thus identified a sufficiently "grievous loss" as to invoke "some orderly process," *id.,* the Court set about defining precisely what process was due.

The Supreme Court's opinion in *Wolff v. McDonnel,* supra, predated *Greenholtz* by five years. According to the Nebraska statute applicable when *Wolff* was decided, good conduct time was to be deducted from an inmate's minimum term, for purposes of determining the date of his eligibility for parole, or from his maximum term, for purposes of determining date of mandatory release.[3] 418 U.S. at 546 n. 6, 94 S.Ct. at 2970 n. 6, 41 L.Ed.2d at 945 n. 6. "In cases of flagrant or serious misconduct," such good time was subject to forfeiture by prison authorities. 418 U.S. at 545 n. 5, 94 S.Ct. at 2969 n. 5, 41 L.Ed.2d at 945 n. 5. Such forfeitures were "to be reported to and considered by parole authorities." 418 U.S. at 546 n. 6, 94 S.Ct. at 2970 n. 6, 41 L.Ed.2d at 946 n. 6. Beginning with the premise that prison inmates retain due process rights, albeit "subject to restrictions imposed by the nature of the regime to which they have been lawfully committed[,]" 418 U.S. at 556, 94 S.Ct. at 2975, 94 L.Ed.2d at 951, the Supreme Court in *Wolff* concluded:

---

**3.** Neither Texas nor Nebraska any longer treat good conduct time as "earned commutation of sentence." Compare *Ex parte Anderson,* 149 Tx.Cr.R. 139, 192 S.W.2d 280 (1946), construing former Article 61841, V.A.C.S., repealed by Acts 1977, 65th Leg., p. 932, ch. 347, § 3, eff. August

29, 1977, to *Von Bokelman v. Sigler,* 186 Neb. 378, 183 N.W.2d 267 (1971). Presently good conduct time does not reduce the time for which the convict will endure some form of custody, real or constructive.

"... the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated."

418 U.S. at 557, 94 S.Ct. at 2975, 41 L.Ed.2d at 951. Cf. *Superintendent, Massachusetts Correctional Institution, Walpole v. Hill*, 472 U.S. 445, at 454, 105 S.Ct. 2768, at 2774, 86 L.Ed.2d 356, at 364 (1985) (Decided after *Meachum* and *Greenholtz*, this case holds that "*[w]here* a prisoner has a liberty interest in good time credits, the loss of such credits threatens his prospective freedom from confinement by extending the length of imprisonment. Thus the inmate has a strong interest in assuring that the loss of good time credits is not imposed arbitrarily.")

*Meachum v. Fano*, supra, addressed the question of whether due process rights were implicated in the transfer of an inmate, presumably as a disciplinary measure, to a less desirable facility than that to which he had been originally assigned. The Supreme Court found it unnecessary to inquire beyond the first stage of the *Morrissey* analysis, finding that "Massachusetts law conferred no right on a prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct." 427 U.S. at 226, 96 S.Ct. at 2539, 49 L.Ed.2d at 460. In view of this absence of a state conferred right, the Court concluded that:

"[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is *too ephemeral and insubstantial* to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all."

427 U.S. at 228, 96 S.Ct. at 2540, 49 L.Ed.2d at 461. Thus what has come to be known as the Court's "entitlement doctrine" was applied for the first time to delineate the liberty interest of prisoners under the Fourteenth Amendment. See e.g., Note, Two Views of a Prisoner's Right to Due Process: *Meachum v. Fano*, 12 Harv.C.R.–C.L.L.Rev. 405 (1977). According to this doctrine, a lawfully convicted prison inmate's liberty interest is essentially limited to rights specifically conferred by the State. Subsequent cases have honed and refined the doctrine.

The next application of the entitlement doctrine to inmate liberty interests under the Fourteenth Amendment occurred in *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, supra. In considering the question whether Nebraska inmates had a liberty interest in obtaining parole, the Supreme Court there rejected the assertion that a liberty interest could arise by simple virtue of the fact that the State, in establishing a parole system, had created the *possibility* of parole. First the Court noted what it found to be "a crucial distinction between being deprived of a liberty one has," as is the case once parole has been granted, see *Morrissey v. Brewer*, supra, "and being denied a conditional liberty that one desires." 442 U.S. at 9, 99 S.Ct. at 2105, 60 L.Ed.2d at 676. Additionally the court distinguished the granting of parole from parole revocation according to "the nature of the decision that must be made in each case," finding that in general:

"[t]he parole-release decision ... is more subtle and depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals by the Board members based upon their experience with the difficult and sensitive task of evaluating the advisability of parole release. Unlike the revocation decision, there is no set of facts which, if shown, mandate a decision favorable to the individual."

442 U.S. at 9–10, 99 S.Ct. at 2105, 60 L.Ed. 2d at 677. In short, the Court held that the mere "hope" that such a wholly discretionary assessment would militate in favor of granting an inmate parole would not alone

create for him a liberty interest cognizable under the Fourteenth Amendment.

Nevertheless, the Court found that specific provisions of the Nebraska parole statute, mandating that an inmate be paroled except under certain enumerated circumstances, engendered a sufficient "expectation of release" as to call into play at least "some measure of constitutional protection." 442 U.S. at 12, 99 S.Ct. 2106, 60 L.Ed.2d at 678. It was emphasized, however, that "whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." 442 U.S. at 12, 99 S.Ct. at 2106, 60 L.Ed.2d at 678–79. Thus, after *Greenholtz*, the "entitlement" must be of a definite character, and the discretion of the conferring agency of the State sufficiently circumscribed, before it can be said that a liberty interest under the Fourteenth Amendment has been created. See also *Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675, 688 (1983) ("Unmistakably mandatory" statutory language, requiring that an inmate not be kept in administrative segregation "absent specified substantive predicates," created liberty interest.); *Board of Pardons v. Allen*, —— U.S. ——, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

Whether of its own volition, then, or simply by a quirk of statutory drafting, Nebraska has committed itself to providing its inmates the appropriate "measure of constitutional protection" of conferred liberty interests, both in parole itself, and in the maintenance of good conduct time, which is a factor in determining the date of parole eligibility. By contrast, in *Williams v. Briscoe*, supra, the Fifth Circuit determined that the Texas parole statute "does not create that protectible expectancy of release recognized by the Supreme Court in *Greenholtz*." 641 F.2d at 277. See prior Article 42.12, §§ 14A(e), and 15(a), (f), V.A. C.C.P., substantially identical to present Article 42.18, §§ 7(c), and 8(a), (f), V.A.C. C.P. That determination has apparently survived the most recent Supreme Court holding in this area, see *Board of Pardons v. Allen*, —— U.S. at —— n. 10, 107 S.Ct. at 2421 n. 10.

With respect to the instant application, two questions arise for purposes of Fourteenth Amendment analysis. First, do Texas provisions impart more than a hope or unilateral expectation that good conduct time accrued will hasten parole eligibility, such that what is effectively a preemption of that expectation, upon the finding at trial of use or exhibition of a deadly weapon during the commission of the offense, would constitute a "grievous loss"? *Morrissey v. Brewer*, 408 U.S. at 482, 92 S.Ct. at 2601, 33 L.Ed.2d 495. Secondly, even if they do, is that expectation nevertheless insufficient to establish a liberty interest, in view of the holding in *Williams v. Briscoe*, supra, that Texas statutes do not, in any event, support a protectible "expectation of release" regardless of when the date of eligibility for parole occurs? In other words, is the question whether applicant has a liberty interest in accruing good conduct time toward parole eligibility necessarily a function of whether he can legitimately claim a liberty interest in parole itself? At least one court of appeals has effectively answered this latter question affirmatively. *Moncier v. State*, 704 S.W. 2d 451 (Tex.App.—Dallas 1986). Indeed, *Wolff v. McDonnell*, supra, notwithstanding, logic compels such a conclusion in the premises.

As Justice White observed, however, "[t]he individual States ... are free to follow another course, whether by statute, by rule or regulation, or by interpretation of their own constitutions." *Meachum v. Fano*, 427 U.S. at 229, 96 S.Ct. at 2540, 49 L.Ed.2d at 461–62. We need not define "liberty" for purposes of due course of law analysis under Article I, § 19 of the Texas Constitution in accordance with the "entitlement" doctrine that has developed in federal due process jurisprudence, and we decline to define it in those terms. Though the logic of the State Prosecuting Attorney's argument is valid, we reject its premises.

II.

It is beyond dispute that once an accused has been lawfully convicted of a criminal offense and sentenced to a term of incar-

ceration in accordance with applicable penal provisions, his freedom from confinement is forfeited. Nevertheless, inmates in the penitentiary "may not be deprived of life, liberty, or property without due process of law[,]" subject though they may be "to restrictions imposed by the nature of the regime to which they have been lawfully committed." *Wolff v. McDonnell,* 418 U.S. 557, 94 S.Ct. 2974–75, 41 L.Ed.2d 951. Under the Supreme Court's "entitlement" doctrine, however, the only residuum of liberty afforded an inmate is that specifically conferred upon him by the State. This notion tacitly presupposes that lawful confinement necessarily extinguishes any innate sources of liberty, to be replaced, if at all, by the beneficence of the State.

In dissenting opinions in *Meachum v. Fano* and *Hewitt v. Helms,* both supra, Justice Stevens has articulated an alternative understanding of that "liberty" which gives rise to Fourteenth Amendment due process protections behind prison walls. Finding his view to be consonant with our own understanding of "liberty" under Article I, § 19, we will adopt it.

### A.

In *Meachum* Justice Stevens began his response to the Court's first application of the entitlement doctrine to inmates' liberty as follows:

"If a man were a creature of the State, the analysis would be correct. But neither the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen. The relevant state laws either create property rights, or they curtail the freedom of the citizen who must live in an ordered society. Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source.

"I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable

rights. It is that basic freedom which the Due Process Clause protects, rather than the particular rights or privileges conferred by specific laws or regulations."

427 U.S. at 230, 96 S.Ct. at 2541, 49 L.Ed.2d at 462. Finding thus that liberty is an inherent right, neither constitutionally nor statutorily created, Justice Stevens proceeded to address the question whether the valid abrogation of a convicted criminal's liberty was "total or partial." He concluded that the Court's decision in *Morrissey v. Brewer,* supra, necessarily dispelled any vestiges of the antiquated notion of convicts as mere slaves of the State, inasmuch as it effectively held:

"that the individual possesses a residuum of constitutionally protected liberty while in legal custody pursuant to a valid conviction. For release on parole is merely conditional, and it does not interrupt the State's legal custody."

427 U.S. at 232, 96 S.Ct. at 2541–42, 49 L.Ed.2d at 463. Justice Stevens identified the still-incarcerated inmate's residual liberty interest as:

"a protected right to pursue his limited rehabilitative goals, or at the minimum, to maintain whatever attributes of dignity are associated with his status in a tightly controlled [prison community]. It is unquestionably within the power of the State to change that status, abruptly and adversely; but if the change is sufficiently grievous, it may not be imposed arbitrarily. In such case due process must be afforded."

427 U.S. at 234, 96 S.Ct. at 2543, 49 L.Ed.2d at 465.

In his opinion in *Hewitt* Justice Stevens elaborated upon his view of the liberty interest that survives lawful imprisonment. Speaking first of that liberty enjoyed by ordinary, lawabiding citizens, Justice Stevens characterized it also as a "residuum of liberty"—not unfettered license, but freedom to proceed at will, subject only to legitimate regulation for the common good. From this premise, he continued:

"But the [Due Process] Clause is implicated when the State singles out one

person for adverse treatment significantly different from that imposed on the community at large. For an essential attribute of the liberty protected by the Constitution is the right to the same kind of treatment as the State provides to other similarly situated persons. A convicted felon, though he is properly placed in a disfavored class, retains this essential right.

"Thus, for a prisoner as for other persons, the grievousness of any claimed deprivation of liberty is, in part, a relative matter: one must compare the treatment of the particular prisoner with the customary, habitual treatment of the population of the prison as a whole. In general, if a prisoner complains of an adverse change in conditions which he shares with an entire class of his fellow prisoners as part of the day-to-day operations of the prison, there would be no reason to find that he had been deprived of his constitutionally protected liberty. But if a prisoner is singled out for disparate treatment and if the disparity is sufficiently severe, his liberty is at stake. [footnotes omitted.]"

459 U.S. at 485–86, 103 S.Ct. at 879, 74 L.Ed.2d 697–98. In a footnote, Justice Stevens acknowledged that it is up to the State initially to define "the institutional norm" for treatment of the prison community as a whole. Once "the State establishes the baseline of how it customarily treats the prison population[,]" *id.*, n. 12, whether by statute, administrative rule, or simply unwritten policy or practice, any substantial deviation from that line in a particular case will impact a liberty interest.

"Hence, as we noted in *Wolff,* the State is not required to allow prisoners good-time credits. But if it establishes such a system, it may not arbitrarily deprive a prisoner of these credits on the ground that the prisoner has engaged in serious misbehavior, unless its procedures for so doing are constitutionally adequate."

*Id.* In a nutshell, any adverse action taken against an inmate, seriously at odds with the treatment of the general prison popula-

tion, will invoke procedural protections to insure that the discrepancy is not arbitrary.

### B.

As we have already signaled, we find Justice Stevens' view of the origins of constitutionally protected liberty more palatable. We find it so for a number of reasons.

1) First and foremost, at least insofar as the cases may be read to suggest that valid sentence of confinement cancels all theretofore intrinsically derived liberty interests, they run counter to fundamental tenets of human worth and dignity. It is simply repugnant to view the residual liberty interest of a prison inmate as a government dole.

2) The Supreme Court itself has not been entirely consistent in its application of the entitlement doctrine to inmate liberty interests. No mention is made of particular statutory or regulatory language in either *Morrissey* or *Wolff,* both supra. In *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), which was decided after both *Meachum* and *Greenholtz,* the Court held that some process was due before the State could transfer a prisoner to a mental hospital. Though the Court found an objective expectation, grounded in statute, that such a transfer would occur only upon specified findings, it also seemed to embrace the notion that any treatment of a prisoner outside the parameters of what the Court considers to be restrictions normally attendant to lawful sentence of confinement would trigger due process guarantees regardless of the existence of the statute. 445 U.S. at 491–94, 100 S.Ct. at 1263–64, 63 L.Ed.2d at 564–66. This suggests that *some* residual liberty remains to the inmate quite apart from any specific State entitlement. See Flax, Liberty, Property, and the Burger Court: The Entitlement Doctrine in Transition, 60 Tul.L.R. 889 (1986).

3) In *Wolff* the Supreme Court reiterated that "[t]he touchstone of due process is protection of the individual against arbitrary action of the government," 418 U.S. at 558, 94 S.Ct. at 2976, 41 L.Ed.2d 952. If

arbitrary State action is indeed the evil to be avoided, it makes little sense to establish a threshold test for identification of a prisoner's due process right that first requires the finding of a liberty interest, and then defines that interest in terms of the narrowness of the discretion which the State imposes upon itself in handling its prison population. The exercise of discretion is by its very nature an application of fact to standard, whether that standard is set by statute, regulation, policy or custom. Relative indefiniteness of the standard does not remove discretion from the realm of fact. Discretion exercised in the absence of a factual base to inform it would amount to pure capriciousness. "Facts are critical, whether or not they are mentioned in a state statute as a basis for decision. Procedures designed to elicit accurate information will always promote instrumental values." Herman, The New Liberty: The Procedural Due Process Rights of Prisoners and Others Under the Burger Court, 59 N.Y.U.L.R. 482, 546 (1984). To conclude, as the Court did in *Meachum,* that an inmate is not entitled to a hearing before disciplinary transfer to another prison facility because "prison officials have discretion to transfer him for whatever reason *or for no reason at all* [,]" 427 U.S. at 228, 96 S.Ct. at 2540, 49 L.Ed.2d at 461, is but to invite that arbitrariness due process is traditionally thought to keep in check.

4) Albeit in the context of analyzing what process is due in the revocation of parole, rather than the predicate question of whether a parolee has any liberty interest to protect, the Supreme Court in *Morrissey* found that both society and the parolee have an interest in "basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." 408 U.S. 484, 92 S.Ct. 2602, 33 L.Ed.2d 496. See also *Ex parte Williams,* 738 S.W.2d 257 (Tex.Cr.App. No. 69,732, delivered February 11, 1987) (Mandate stayed pending disposition of State's petition for writ of certiorari in the United States Supreme Court). As imperative as that interest in fairness is in the context of parole revocation, it is all the more so inside prison walls. Unventilated disciplinary measures, even following principled administrative decisions, are apt to generate an appearance of arbitrariness detrimental to prison harmony and to the rehabilatative process. See Note, Due Process Behind Bars—The Intrinsic Approach, 48 Ford.L.Rev. 1067, 1081 (1980). Tying liberty, and hence due process, to the right or expectation conferred by a sufficiently circumscribed statutory or regulatory scheme will simply confound the average prison inmate, who bases his expectation, not on any awareness of that scheme, but on his knowledge of the daily practices and customs of prison and parole authorities. See *id.,* at 1084.

Justice Stevens' conception of prisoners' liberty avoids all of these pitfalls. By according some measure of procedural protection whenever an inmate is singled out for treatment that is seriously out of step with that of the remaining inmate population, this view recognizes the inherent dignity even of the convicted felon, is grounded in the quotidian realities of the inmate's existence rather than fortuities of statutory construction, and maintains the appearance of fair and purposeful administration of prison life. For these reasons we adopt this view of the convict's residual liberty interest under Art. I, § 19 of the Texas Constitution.

### III.

We now inquire whether applicant has a protectable liberty interest under Art. I, § 19, supra, and if so, whether due course of law requires notice of the State's intention to obtain in the judgment an affirmative finding of use or exhibition of a deadly weapon under Article 42.12, § 3g(a)(2), supra.

### A.

■ Obviously applicant's situation is distinguishable from that of the incumbent inmate whose accrued good conduct time is in jeopardy on account of some serious infraction of TDC disciplinary rules. See generally, TDC Disciplinary Rules and Procedures for Inmates (July 1986). In fact, an affirmative finding under § 3g(a)(2)

does not prevent the accumulation of good conduct time, which will still count toward the date of the inmate's mandatory release. Art. 42.18, § 8(c), V.A.C.C.P.[4]  What the affirmative finding does accomplish, however, is prospectively to deny the *effect* of accrued good conduct time credits to accelerate the date of parole eligibility.  Article 42.18, § 8(b), supra, reads in relevant part:

"... if the judgment contains an affirmative finding under Subdivision (2), of Subsection (a) of Section 3g of [Article 42.12, supra], [a prisoner] is not eligible for release on parole until his actual calendar time served, *without consideration of good conduct time,* equals one-third of the maximum sentence or 20 calendar years, whichever is less, but in no event shall he be eligible for release on parole in less than two calendar years.  *All other prisoners* shall be eligible for release on parole when their calendar time *plus good conduct time* equals one-third of the maximum sentence imposed or 20 years, whichever is less."[5]

Insofar as an affirmative finding thus mandates that its recipient serve one-third "flat" time before attaining eligibility for parole, it constitutes a basis for treating him differently than the statutorily fashioned institutional norm applicable to "all other prisoners."  Because parole itself involves actual, albeit conditional freedom from confinement, we think the prospective denial of any opportunity to earn an early eligibility date constitutes sufficiently disparate treatment as to implicate a liberty interest under Art. I, § 19, supra, and we so hold.

The Legislature has chosen to condition this disparate treatment upon a particular finding of fact to be made during the course of the accused's trial.  Thus, many of the essential trappings of due course of law are already incorporated; in fact, more than ordinarily required to protect the liberty interests of the incarcerated inmate.  Compare *Greenholtz,* supra.  At least where the indictment fails to allege that a weapon was used or exhibited which is alleged to be, or is *per se,* a deadly weapon, however, the accused has no way of knowing that such a finding may even be made until the special issue required in these circumstances by *Polk,* supra, has been submitted to the jury,[6] or the trial court, acting as factfinder, see *Ex parte Webster,* 704 S.W.2d 327 (Tex.Cr.App.1986), enters the affirmative finding in the judgment! Patently lacking is that aspect of due course of law which makes efficacious all others, *viz:* notice—here, that from all the facts presented at the trial constituting the primary offense may be culled a further finding that will serve to differentiate the accused from "all other prisoners" sent to Texas Department of Corrections.  Simply put, the accused has not been alerted that a particular finding of fact, having an incrementally greater impact upon his liberty than a bare conviction, may even be made.[7]

4. Effective September 1, 1987, however, an affirmative finding will also operate to deprive the inmate of mandatory supervision altogether! Acts 1987, 70th Leg., ch. 384, § 6, p. 3761, eff. Sept. 1, 1987.  In prosecutions for offenses committed after September 1, it is arguable that even under an "entitlement" theory of liberty due process and due course of law will require notice that an affirmative finding will be sought, since if made that finding would mean the accused loses what the statute otherwise mandates—conditional freedom when his calendar time plus good time equals length of sentence.  We do not reach that question today, of course.

5. Again by virtue of Acts 1987, 70th Leg., ch. 384, § 5, p. 3759, eff. Sept. 1, 1987, the relevant periods are now "one-fourth of the maximum sentence or 15 calendar years ..."

6. Applicant alleges, and the State does not dispute, that he first learned an affirmative finding was possible when "the jury charge was read and I ask [sic] my lawyer what the special issue ment [sic].  He said everything was alright, not to worry about it, so I didn't."  Finding this allegation uncontested, we accept it as true. See e.g., *Ex parte Williams,* 589 S.W.2d 711 (Tex.Cr.App.1979).

7. At issue here is not "notice" as to the primary offense sufficient to support a plea in bar, Article 21.04, V.A.C.C.P., or to inform the accused of *precisely* what he is charged with, Articles 21.-02(7) and 21.11, V.A.C.C.P., the absence of which this Court has deemed to be a defect of form, and hence, subject to objection in order to preserve error on appeal. *American Plant Food Corporation v. State,* 508 S.W.2d 598 (Tex.Cr. App.1974).  But see current Article 1.14(b), V.A. C.C.P., as amended by Acts 1985, 69th Leg., p.

On the civil side, in the preservation of legally protected interests, "[q]uestions frequently arise as to the adequacy of a particular form of notice in a particular case. [Citations omitted.] But as to the basic requirement of notice itself there can be no doubt ..." *Armstrong v. Manzo*, 380 U.S. 545, 550, 85 S.Ct. 1187, 1190–91, 14 L.Ed.2d 62, 66 (1965). With reference to a requirement of notice in the Probate Code, the Texas Supreme Court has observed:

> "This undoubtedly is based upon the postulate that procedural due process 'requires notice that is reasonably calculated to inform the parties of proceedings which may directly and adversely affect their legally protected interests.' *City of Waco v. Roddey*, 613 S.W.2d 360, 365 (Tex.Civ.App.—Waco 1981, writ dism'd)." [8]

*Cunningham v. Parkdale Bank*, 660 S.W. 2d 810, 813 (Tex.1983). We dare not "den[y] a constitutional guarantee against deprivation of liberty which would be routinely granted against deprivation of property when proper notice has not been given." *Ex parte Webster*, supra at 330 (Clinton, J., dissenting).

Consequently we conclude applicant was entitled to notice that the State would pursue an affirmative finding as authorized by Article 42.12, § 3g(a)(2), supra.[9] This is not to say, necessarily, that that notice must appear in the indictment. We next address that question.

### B.

An indictment serves a dual function. On the one hand it "is the written statement of a grand jury accusing a person therein named of some act or omission which, by law, is declared to be an offense." Article 21.01, V.A.C.C.P. This provision gives statutory substance to the right conferred in Article I, § 10 of the Texas Constitution to have a grand jury screening before a person may "be held to answer for a criminal offense" of the magnitude of felony. On the other hand, the indictment is "[t]he primary pleading in a [felony] criminal action on the part of the State[.]"[10] Article 27.01, V.A.C.C.P. Thus the indictment serves interests of both the State and the accused.

---

2196, ch. 577, § 1, effective Dec. 1, 1985. (Defects of "form *or* substance" must be objected to "before the date on which the trial on the merits commences" to preserve appellate review.) The Court has found this variety of notice to emanate from the mandate of Article I, § 10, that "no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury," which shall specify "the nature and cause of the accusation against him[.]" See *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980) (Opinion on State's motion for rehearing). The notice of which we speak today, however, is that firmly rooted in fundamental precepts of due process and due course of law—the right to be informed, at a bare minimum, that a particular proceeding (over and above the determination of guilt/innocence and sentence) will occur which may operate to further diminish the accused's liberty interest.

**8.** The "legally protected interest" in *City of Waco v. Roddey*, supra, was in a vacant house surrounded by brush, debris and tall grass, partially demolished by the City of Waco without affording Roddey that proper notice procedural due process requires. 613 S.W.2d at 365–66.

**9.** We are not unmindful that in *Vigneault v. State*, 600 S.W.2d 318 (Tex.Cr.App.1980) we found that a capital defendant was not deprived

of notice when special issues expressly authorized by Article 37.071, V.A.C.C.P., were not pled in the indictment. There we reasoned, however, that notice inhered in "the fact that the issues to be submitted to the jury are in every capital case identical and wholly independent of the varying fact situations that may come to trial[.]" *Id.*, at 330. Just as the properly pled allegation of a primary offense, together with allegations of prior offenses, if any, will provide sufficient information from which range of punishment can accurately be gauged, so will the indictment alleging an offense under the terms of V.T.C.A. Penal Code, § 19.03, put the accused on notice that his punishment will invariably be assessed according to the answers given to Article 37.071 special issues. By contrast, from an indictment neither expressly alleging a deadly weapon was used or exhibited, nor alleging use or exhibition of what is a deadly weapon *per se,* the accused cannot be expected to determine with any degree of certainty whether a special issue will be submitted, and hence whether he will be subjected to the deleterious effect of an affirmative finding.

**10.** As originally enacted in the 1856 Code, this provision held out that indictment or information is the "only" pleading of the State. Since a recodification of the Code in 1879, the statute has read as it does today.

■ "Everything should be stated in an indictment which is necessary to be proved." Article 21.03, V.A.C.C.P. It was long ago held that "[e]very circumstance constituting a statutory offense which would affect the degree of punishment, must be alleged in the indictment." *Long v. The State*, 13 Tex. 6, 10 (1871). Thus, prior convictions to be used for enhancement of punishment under felony recidivist statutes must be pled in the indictment, and proof of an upheld prior conviction will not support an enhanced sentence. See *Moore v. State*, 154 Tex.Cr.R. 307, 227 S.W.2d 219 (1950). This is true even though a prior offense alleged for enhancement is not really a component element of the primary offense, but only "an historical fact to show the persistence of the accused, and the futility of ordinary measures of punishment as related to him." *Sigler v. State*, 143 Tex.Cr.R. 220, 157 S.W.2d 903, 904 (1942). It is at least arguable that use or exhibition of a deadly weapon is similarly a "circumstance constituting a statutory offense which would affect the degree of punishment," and hence "must be alleged in the indictment."

■ However, the affirmative finding at issue here affects not so much the degree of punishment as its character. Once paroled, the convict remains in the constructive custody of the State for the full duration of his sentence. See note 3 *ante*. Though due course of law requires notice that a fact finding will take place which may detrimentally shade the character of his custody, we are unprepared to hold concomitantly that Article I, § 10 necessitates a specific grand jury determination of probable cause to support that fact. We hold only that the State must plead it.

How *may* the State plead it? Though "[t]he verdict in every criminal action must be general[,]" Article 37.07, § 1(a), V.A.C.C.P., this same provision authorizes jury findings upon special pleas. As has been suggested elsewhere, the literal language of Article 27.01, supra, is broad enough to accommodate a special plea on the part of

the State. *Polk v. State*, supra at 398 (Clinton, J., concurring). However, aside from the indictment or information, the Code of Criminal Procedure does not provide a specific mechanism to implement such a special plea. Inasmuch as the indictment is the principal charging instrument of the State in a felony prosecution, a special plea of use or exhibition of a deadly weapon would most appropriately be made there. Certainly due course of law requires no more. Again, we should not be understood to say that the right to grand jury indictment under Article I, § 10 extends so far as to guarantee that such a special plea necessarily originate in a specific grand jury finding, or that failure of proof to support that special plea will render the proof insufficient for the offense itself. To the extent it could be so interpreted, we decline to hold that the notice due course of law requires must appear *in the indictment*. However, we reiterate that it may, and probably should appear there, preferably in a separate paragraph, much as enhancement allegations are presently pled. As with enhancement paragraphs, failure to prove the special plea will not affect sufficiency of evidence going to the primary offense.[11]

### IV.

Finally we must determine whether any objection to the submission of the special issue regarding use or exhibition of a deadly weapon has been waived in this case.

Applicant apparently failed to object to submission of the special issue. See note 6, *ante*. At any rate he does not affirmatively contend that he did in fact object. Presumably applicant was afforded an opportunity to scrutinize the proposed jury charge and present an objection, under Article 36.14, V.A.C.C.P., had he chosen to do so. Again, he does not contend otherwise.

■ Essentially applicant now raises error in the court's charge to the jury, *viz:* submission of a special issue which had no support in the State's pleadings. Because

11. Thus is removed the "impediment" to formal pleading of use or exhibition of a deadly weap-

on in the indictment which Judge Miller perceived in *Polk*, 693 S.W.2d at 396, n. 4.

he did not object, applicant must allege "fundamental error"—an egregious error that created such harm as to deprive accused of a fair and impartial trial, or in this case, a fair and impartial hearing on the special issue itself, which only incidentally occurred in the context of his criminal trial. See *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985). Ordinarily the naked allegation of denial of a fair and impartial determination of the special issue is not sufficient to entitle the habeas corpus applicant to relief; he must show that the error so infected the procedure as to render his particular hearing unfair. *Ex parte Maldonado*, 688 S.W.2d 114 (Tex.Cr.App. 1985).

We have already found, in effect, that the trial court committed egregious error in submitting the special issue of use or exhibition of a deadly weapon in the absence of a pleading by the State. The remaining question is whether applicant has shown that the lack of notice so infected the procedure as to render it unfair. Applicant has not made the statement of facts at his trial a part of this habeas corpus record. Nor do we even have a copy of the court's charge, as we did in *Maldonado*, supra. All that appears in this record is a copy of the indictment, and the judgment, which reflects the jury's verdict on the special issue and states: "the Court finds that in accordance with the jury's verdict the defendant used a deadly weapon in the commission of this offense." Such a state of

the record would not ordinarily present facts which, if true, would entitle applicant to relief, under *Maldonado*.

Nevertheless, it has been suggested that "there are some errors so egregious that such a review [as *Almanza* provides] will not save them." *Lawrence v. State*, 700 S.W.2d 208, 218 (Tex.Cr.App.1985) (Clinton, J., dissenting); See also *Fain v. State*, 725 S.W.2d 200, 204 (Tex.Cr.App. 1986) (Clinton, J., concurring and dissenting). Such an error occurred here. Even without reviewing it we might conclude that the evidence at applicant's trial compels the conclusion that he used a deadly weapon, since he was in fact found to have caused death with a knife.[12] But no amount of uncontroverted evidence, however conclusive it may seem, will remedy the fact that applicant was given no prior indication that the nature of the weapon used was to be a particular issue in the case, with additional consequences vis-a-vis his liberty. Indeed, applicant and the State joined issue on the deadly weapon determination, if at all, only after all the evidence was in, both sides had closed, and the charge was read to the jury. Compare *Peltier v. State*, 626 S.W.2d 30 (Tex.Cr. App.1981). Inasmuch as applicant's criminal trial operated also as a forum for litigating the deadly weapon issue, it was conducted *ex parte*. In no event could it be said under these circumstances that a "fair and impartial" proceeding occurred.[13]

12. Applicant's jury found him guilty of murder "as charged in Count 2 of the indictment." But in *Polk* itself we expressly rejected the notion, to be found in, e.g., *Chavez v. State*, 657 S.W.2d 146 (Tex.Cr.App.1983), that an "affirmative" finding could be derived by "necessary implication" from a jury verdict of "guilty as charged" in an indictment pleading facts such as these. That such an indictment will not support an affirmative finding must also mean it does not serve to provide notice that the nature of the weapon will be, in and of itself, a specific issue in the case.

13. Returning to the civil analogue, we note that as a general proposition a judgment must be supported in the pleadings. *Stoner v. Thompson*, 578 S.W.2d 679 (Tex.1979). While issues not raised in the pleadings may nevertheless be tried by express or implied consent, written pleadings must be amended to support special

issues prior to their submission to the trial court or jury. Rule 67, Tex.Rules Civ.Proc. This requirement to amend, however, is subject to waiver for failure to object to the absence of support in the pleadings at the time of submission. See, General Commentary following Rule 274, Tex.Rules Civ.Proc.; e.g., *Scott v. Doggett*, 226 S.W.2d 183 (Tex.Civ.App.—Amarillo 1949, ref'd n.r.e.).

It cannot be argued, however, that the accused in a criminal action has consented to try the affirmative finding special issue simply by virtue of failing to object at trial to admission of evidence showing the nature of the weapon he used or exhibited in the commission of an offense. Indeed, the weapon itself, where available, would invariably be admissible in evidence, if for no other reason than as res gestae of the offense. The accused does not necessarily know that the nature of any weapon he

We therefore conclude that inasfar as it authorized the jury to answer the special issue regarding applicant's use of a deadly weapon, the court's charge in this cause was fundamentally defective. Of course this defect cannot vitiate the conviction and sentence, for it did not impact upon the determination of applicant's guilt or length of sentence. Accordingly, the judgment of the trial court will be reformed to delete the recitation of the jury's answer to the special issue, and the trial court's affirmative finding made thereon. Otherwise we do not disturb the judgment. All other relief prayed for by applicant will be denied.

It is so ordered. The Clerk of this Court is hereby instructed to forward a copy of this opinion to the Texas Department of Corrections.

TEAGUE, J., concurs in result.

W.C. DAVIS and McCORMICK, JJ., dissent.

ONION, P.J., not participating.

MILLER, Judge, concurring.

I agree with the majority that applicant should be given notice that the State seeks an affirmative finding on whether applicant used or exhibited a deadly weapon during the commission of the alleged offense. I would, however, also base this finding on the same rationale which requires pleading enhancement allegations for punishment purposes and not solely on the analysis employed by the majority.

It has been well established since *Long v. State*, 36 Tex. 6 (1871), that every circumstance constituting a statutory offense which would affect the degree of punishment must be pled in the indictment. *Long*, supra, was the first case which engrafted upon the statutory scheme of pleading a *court imposed* requirement that it was necessary to place allegations that the defendant had previously been convict-

ed of a like offense *in the indictment* before the State could avail itself of the enhanced punishment provisions of the Penal Code.

The *Long* decision was based upon the necessity of the State proving that the defendant had prior convictions which were final in order to enhance the defendant's punishment. The Court stated that holding to the contrary would "cut away so much of the pillars of our liberty, which consists in the right of every man to have presented to him an accusation before he is called upon for a defense." *Id.* at 10. The *Long* holding reflects the concern of the Court that the defendant have adequate knowledge of the accusation against him so that he may prepare a defense.

As previously stated, the principle announced in *Long*, supra, is based upon the idea of notice. An accused is entitled to proper notice of any prior conviction which the State seeks to use whether it be an element of the offense or for enhancement of punishment. See *Rogers v. State*, 168 Tex.Cr.R. 306, 325 S.W.2d 697 (1959), and *Parasco v. State*, 165 Tex.Cr.R. 547, 309 S.W.2d 465 (1958). These pleadings requirements inform the accused of the nature and cause of the accusation against him. See *Coleman v. State*, 577 S.W.2d 486 (Tex.Cr.App.1979), and *Bevins v. State*, 422 S.W.2d 180 (Tex.Cr.App.1967).

Although I believe that the rationale of *Long*, supra, and subsequent cases, see infra, support the conclusion concerning notice reached by this Court today, I agree with the majority that notice of the State's intention to seek an affirmative finding on the issue of use or exhibition of deadly weapon is not, in this day and time, required to be *in* the indictment, necessarily. Adequate and timely notice evidenced in the record in some other manner should suffice, although a separate paragraph in the indictment (or addition to it under Art. 28.10, V.A.C.C.P.)[1] would seem adequate,

allegedly used or exhibited is an issue *per se*. Absence of an objection under such circumstances could not reasonably be construed to indicate consensual litigation of a particular issue not raised in the State's pleadings.

1. Article 28.10, V.A.C.C.P. (Supp.1985) states:
   (a) After notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences. On the

if not preferable. With these additional comments, I join the majority opinion.

CAMPBELL and WHITE, JJ., join.

request of the defendant, the court shall allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment or information.

(b) A matter of form or substance in an indictment or information may also be amended after the trial on the merits commences if the defendant does not object.

(c) An indictment or information may not be amended over the defendant's objection as to form or substance if the amended indictment or information charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced.