**Kenneth Wayne SPEERING, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 6–87–069–CR.**

Court of Appeals of Texas,
Texarkana.

Oct. 18, 1988.

Rehearing Denied Dec. 13, 1988.

George M. Secrest, Jr., Sparks & Secrest, Houston, for appellant.

John B. Holmes, Dist. Atty., Harris County Courthouse, Houston, for appellee.

CORNELIUS, Chief Justice.

Kenneth Wayne Speering was convicted of murder and assessed punishment at

twenty years' confinement and a $10,000.00 fine. On appeal, he asserts that the evidence is insufficient to support the conviction. He also contends that the trial court erred in excluding background evidence supporting expert witnesses' testimony, and in refusing to declare a mistrial because of inflammatory remarks by a State's witness and because of improper jury argument. We overrule these contentions and affirm the judgment. We agree, however, with a point contending that a "deadly weapon" finding was improperly included in the judgment for purposes of Tex.Code Crim.Proc.Ann. art. 42.18, § 8(b) (Vernon Supp.1988), and reform the judgment to delete that finding.

The witnesses' testimony, which we summarize and paraphrase, would support a finding of the following facts:

On September 18, 1984, Shelley Speering was found dead at her parents' home. She had been stabbed repeatedly with a large knife and had also been strangled. Her husband was Kenneth Speering, a fireman for the Houston Fire Department. Shelley and Kenneth had been married since March of 1984, and were expecting a child in two months or less. Throughout their marriage, both Shelley and Kenneth, as well as Shelley's parents, the Roricks, had been continually harassed by telephone calls in which an unidentified caller would warn or threaten the listener, or merely hang up.

Shelley and Kenneth lived at 5514 Maywood, not far from her parents' home, which is located at 6334 Oban. On the morning of September 18, Kenneth had just gotten off from a twenty-four hour shift of work that began at 6:30 a.m. on September 17. Shelley had spent the night at her parents' home. Kenneth arrived at the Oban Street residence early that morning. Vernon Rorick, Sr., Shelley's father, had already gone to work for the day, and Shelley and her mother, JoAnn Rorick, were still in bed. Kenneth did not have a key to the residence. JoAnn Rorick awoke at about 8:15, and found Kenneth in the kitchen. Kenneth told her that he was going to go clean up at the Maywood Street home before coming back to pick up Shelley to go shopping. JoAnn left the house at 8:50 a.m. to pick up her mother at the hospital. Kenneth had to move his car out of the driveway to let her out. As she drove off, she saw Kenneth go back up the driveway.

Kenneth proceeded to the house on Maywood. Shelley's half-brother, Vernon Rorick, Jr., was living with the Speerings at that time, and his girlfriend, Wendy Allen, had spent the night at their house. Vernon testified that he heard the shower running at 9:00 a.m., and got up to see Kenneth in the hall, still fully dressed. They spoke briefly, and then Kenneth went into the bathroom to shower. Vernon was about to call in sick to his place of work when Shelley telephoned. Vernon answered, and during his conversation with Shelley, he asked her to set up a doctor's appointment for him. She told him that she had just received another prank call that morning, that she was frightened, and that she wanted Kenneth to come over as quickly as possible. Vernon gave the message to Kenneth, received an affirmative response, and then came back to the telephone to pass the response on to Shelley.

Vernon further testified that he and Shelley spoke on the telephone again after Kenneth got out of the shower. Shelley told Vernon then that she had set up his doctor's appointment and that she did not want Kenneth to stop for a paper on the way over to her parents' residence because she wanted him to come as quickly as possible. Kenneth indicated to Vernon that he planned to pick up a paper anyway, but asked him not to tell Shelley. Kenneth then left the Maywood Street home going to the Oban Street residence. A clerk at a convenience store along the way testified he remembered Kenneth coming in and being in the store not more than a couple of minutes to get change.

Vernon also testified that after Kenneth left, someone at the fire station called to speak to Kenneth about a problem with the station's soda machine. Vernon promised to pass the message along to Kenneth. He then waited what he thought was long enough for Kenneth to get to the Oban

Street house, which he estimated was about seven minutes. Then he called, but no one answered. Vernon thought Shelley and Kenneth might be heading back to the Maywood Street residence, so he decided to wait before calling again.

JoAnn Rorick testified that while she was at the hospital, she received a call from Shelley. Shelley told her that she was frightened because of three prank calls she had received that morning. She also told her mother that she had set up a doctor's appointment for her brother and that Kenneth was on his way over. When JoAnn hung up the telephone she looked at the clock at the nurses' station, and it read 9:18.

Alfred Resendez, a neighbor of the Roricks and a fellow fireman of Kenneth's, testified that he was taking garbage out to the curb that morning and saw Kenneth arrive at the Roricks' home. They greeted each other. Resendez did not see any other vehicle come to the home until he heard the sirens of an ambulance.

Vernon testified that he tried to call Kenneth and Shelley at the Oban Street residence again after his first unanswered attempt. When the call again went unanswered, he and Wendy began to fear that something had happened to the baby. They were getting ready to go to the Oban Street residence when Kenneth called. Wendy answered the phone and could barely understand Kenneth's frantic and hysterical words. Vernon then took the phone and understood Kenneth to say for them to come quick, that Shelley was dead.

Vernon and Wendy sped to the residence, and arrived in two to three minutes, shortly before the ambulance arrived. They saw Kenneth moving rapidly from the emergency vehicle to the house, and both noticed that Kenneth's shirt had blood spattered on it. When the two entered the house with Kenneth, they saw Shelley's body lying on the floor. She was dressed in her nightgown and was very bloody. A large kitchen knife remained in her body with the handle, wrapped in a towel, protruding from her chest. The emergency personnel prevented Vernon from approaching the body, but let Kenneth through. Kenneth raised his wife's body up to him, but did not press his chest up to hers.

Sergeant W.E. Kay of the Houston Police Department testified that he arrived on the scene and cleared the civilians from the home. He instructed Kenneth, Vernon and Wendy to remain separated until he could take their statements. Several other officers arrived to investigate the scene. The officers had Kenneth remove his bloodied clothes so they could take them as possible evidence. Vernon, Wendy and Kenneth then went downtown to give statements to the police.

Kenneth testified that he had arrived at the Oban Street residence and found the usually locked door unlocked. Pushing the door open, he found his wife's body on the floor between the kitchen and the living room. He then began to think like an emergency medical technician, for which he had been trained. He checked her airway, breathing and circulation, which he called the "ABC's." He then tried to perform cardiopulmonary resuscitation. Although he noticed her bleeding, he did not notice the protruding knife handle until he attempted to lift her and remove the towel which was covering the handle. Other evidence showed that the knife had actually penetrated the towel twice, and the towel was still pinned by the knife to Shelley's chest. When Kenneth's efforts to resuscitate Shelley were not successful, he went to the bathroom to wash his hands and applied some water to his wife's forehead. He then called the police. The police registered his call as coming in at 9:29 a.m.

Shelley died from multiple stab wounds to the chest and neck and from manual strangulation. The medical examiner could not with certainty determine which injuries caused death, but his opinion was that she was initially strangled to death and that the stabbing and cutting were done to hide the strangulation. The body also had a number of contusions. The fetus did not survive.

### SUFFICIENCY OF THE EVIDENCE

■ Kenneth's first contention is that the evidence is insufficient to support the conviction.

In reviewing the sufficiency of the evidence, we view it in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Moreno v. State,* 755 S.W.2d 866 (Tex.Crim.App.,1988). In circumstantial evidence cases, a rational trier of fact must also be unable to find a reasonable alternative hypothesis than the guilt of the accused. *Carlsen v. State,* 654 S.W.2d 444 (Tex.Crim.App.1983).

Viewing the evidence in the light most favorable to the verdict, the record can support the following: Shelley was murdered some time between 9:18 a.m., when she spoke by telephone with her mother at the hospital, and 9:29 a.m., when the police received the phone call from her husband reporting that Shelley was injured. Shelley was a modest person, and it was unlikely that she would have been seen, other than by her husband, in her nightgown, without covering herself in her bathrobe, but when she was found she was wearing only her nightgown and underwear. The police found no signs of a forced entry, justifying an inference that Shelley willingly allowed the assailant into the house.

Kenneth left his house at approximately 9:10 or 9:11 that morning, heading for the Oban Street residence. Police who replicated the drive from the Maywood Street house to the Oban Street house, including a three-minute stop at the convenience store where Kenneth stopped, testified the trip took eight minutes.

Arthur Resendez, a neighbor of the Roricks, saw Kenneth drive up to the house that morning, and shortly afterwards heard the ambulance sirens. Before Kenneth arrived, Resendez had been outside for fifteen to twenty minutes, and had not seen anyone walking or driving to or from the residence, although he had gone from inside to outside some during that time.

When Kenneth was seen after his wife was dead, he had scratches under his right eye and on his arm that neither Mrs. Rorick nor Vernon had noticed when they had spoken to him earlier that morning. Shelley had a broken and torn fingernail on her right hand, but no skin tissue was found under the nail.

There was testimony that Kenneth had blood spattered on his shirt, jeans and shoes. One expert for the State testified that the pattern of blood spatter was consistent with what he would expect to see if a person wearing the shirt had been in very close proximity to a person being stabbed with some force so that blood would spatter onto the shirt. The expert also stated that blood transfer patterns on the back of Kenneth's shirt were consistent with a blood-soaked towel wrapped around a knife striking the back of his shirt as he applied multiple stab wounds to a victim. Kenneth's explanation for the blood spatters on his shirt was that he performed CPR on Shelley. The State's expert, however, testified that he had once seen blood expelled from an open chest wound when the injured person was given CPR, and that the blood did not project more than one and a half to two inches and did not get onto the shirt of the person applying the CPR.

The State produced evidence that Kenneth's mother did not like Shelley and thought that she was not good enough for Kenneth. There was also evidence that Shelley had argued with Kenneth, asserting her belief that his mother was the maker of the harassing telephone calls, and that on one occasion when they argued about Kenneth's mother being present at the birth of their child Kenneth became violent and damaged a coffee table by kicking it.

The State also produced testimony that when Kenneth was being taken to the police station he said to Vernon, "they know I done it," and at Shelley's funeral he said, "Shelley, I'm sorry; I didn't mean to hurt you."

In addition there was testimony that Kenneth told one of the paramedics that he took a towel and tried to wipe the blood from Shelley's throat, and that he did not see the knife imbedded in her chest until after he had performed his "ABC's," although evidence showed that the knife had a large handle and was pinning the towel to Shelley's chest. The State also showed

that instead of searching for an assailant after trying to revive Shelley, Kenneth went to the bathroom and washed the blood from his hands and arms before calling the police.

In summary, the expert testimony about blood spatter characteristics; the presence of scratches underneath Kenneth's eye and on his arm; and Shelley's broken fingernail; the harassing calls the morning of the murder; the arguments over Kenneth's mother making the calls and Kenneth's violent reaction on one occasion; and Kenneth's statements and actions at the scene of the crime and afterwards are circumstances pointing to guilt. Moreover, the possibility of an unknown assailant is unlikely considering that there is no known motive; there was no evidence of forced entry, robbery or sexual assault, and Shelley apparently willingly let the attacker in the house; the murder weapon was obtained from the house rather than being brought in; and the extremely brief time (eleven minutes) for a stranger to approach the house unseen, gain entrance, strangle Shelley, secure a knife and towel from the kitchen, stab her repeatedly, and then escape without being seen. We find these combined and cumulative circumstances sufficient to allow the jury to find that all reasonable hypotheses except Kenneth's guilt have been excluded.

### IMPROPER JURY ARGUMENT

The next ground of appeal is that the prosecutor interjected his personal belief as to guilt in his closing argument to the jury.

■ Generally, it is improper for a prosecutor to interject his personal belief in the guilt of a criminal defendant. *Johnson v. State*, 698 S.W.2d 154 (Tex.Crim.App. 1985). The prosecutor can, however, state that he believes, under the evidence produced, that the accused is guilty. In deciding if a jury argument is improper, we view the allegedly improper statements in the context of the entire argument. *Drew v. State*, 743 S.W.2d 207 (Tex.Crim.App.1987). Even if the argument is improper, it is cured by a prompt instruction to the jury to disregard it, unless it is so inflammatory

that its prejudicial effect cannot be removed by such an instruction. *Melton v. State*, 713 S.W.2d 107 (Tex.Crim.App.1986); *Patel v. State*, 720 S.W.2d 891 (Tex.App.— Texarkana 1986, pet. granted).

The challenged statement here occurred while the prosecutor, during closing argument, was commenting about Kenneth's grief over the death of his wife:

[The prosecutor]: He made some graveside statements that—obviously, he is distraught, and there is no question in my mind, that even though I believe him to be the killer, he was distraught at the gravesite.

MR. MALLETT: I think counsel is stating some of his personal beliefs which is not evidence in the case, and I do object to it.

THE COURT: Sustained.

MR. MALLETT: I think the jury needs to be instructed to disregard.

THE COURT: Disregard it.

■ The reason for prohibiting personal opinions about guilt is to prevent the prosecutor from implying to the jury that he knows of other incriminating evidence that has not been produced at the trial. *Wyatt v. State*, 566 S.W.2d 597 (Tex.Crim. App. [Panel Op.] 1978). From the context of the argument here and the nature of the statement, we do not consider it to be that kind of statement. In context, it rather appears to be simply an acknowledgement by the prosecutor that, although he believes the evidence shows Kenneth to be guilty, he concedes the evidence shows that Kenneth was not callous at the gravesite, but showed some remorse. There is no suggestion or implication that the prosecutor knew of incriminating evidence that the jury had not heard. If there was an error in the statement, the trial court's instruction to disregard, made in response to defense counsel's request, was sufficient to cure it.

### EXCLUSION OF BASES FOR EXPERT'S OPINION

■ In the fourth point of error, it is asserted that the trial court erred in re-

fusing to allow a defense expert witness, Dr. Terry Laber, to testify about details underlying the bases of his opinions. The State objected to the proffered testimony on grounds that it was irrelevant to the case at hand.

A bill of exceptions shows the following evidence supporting Dr. Laber's opinion, all of which the trial court excluded: (1) slides taken of a victim in another stabbing case where Dr. Laber was of the opinion that blood spatter had occurred from blood being blown out of the wound when the knife was withdrawn; (2) the opinion of Dr. Gary Peterson, chief medical examiner for Hennepin County, Minnesota, who said that the possibility of such a phenomenon was reasonable; and (3) the opinion of Dr. Bart Epstein, a colleague of Dr. Laber, who reached the same conclusion about that particular incident. The trial court did allow Dr. Laber to testify about what he had observed and about his opinion of what had occurred in that case. It was clear, however, that Dr. Laber had not seen the actual blow-out phenomenon occur, but had seen the possible results of the phenomenon's occurrence and gave his opinion that blow-out had happened.

The defense relies on Tex.R.Crim.Evid. 703, which provides that an expert witness' opinion testimony may be based on inadmissible evidence. This, however, is not the issue raised by the bill or the appeal. Tex.R.Crim.Evid. 705 is the proper rule to address the admissibility of facts or data which underly an expert witness' opinion. Tex.R.Crim.Evid. 705(d) states:

> When the underlying facts or data would be inadmissible in evidence for any purpose other than to explain or support the expert's opinion or inference, the court shall exclude the underlying facts or data if the danger that they will be used for an improper purpose outweighs their value as explanation or support for the expert's opinion. If the facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request.

One commentator has interpreted this subsection to mean that:

> [T]he court must exclude the underlying evidence—i.e., not permit its disclosure to the jury—if the court concludes that the danger that it will be used for an "improper" purpose outweighs its value or support for the expert's opinion.

2 R. Ray, *Texas Law of Evidence Civil and Criminal* § 1402 (Texas Practice 3d ed. Supp.1986).

In this case the trial court found that going back to the facts in another criminal case in order to validate the possibility of a blow-out phenomenon was not relevant to the case at hand. The trial judge stated during discussion outside the presence of the jury:

> It strikes me we are trying another law suit at this point. I don't mind you getting into the fact that he observed the fact and he formed an opinion that is what occurred, but I don't see how in the world photographs of another scene that that is only his opinion that that is what did occur is relevant.

It appears that the trial judge felt that it would confuse the facts of the present case to introduce the information relied upon by Dr. Laber to form his other opinion, because another lawsuit's evidence would be introduced. We conclude that the trial court did not abuse its discretion under Rule 705.

As far as the statements of Dr. Epstein and Dr. Peterson are concerned, we cannot perceive any reversible error. In the first instance, the defense failed to establish in evidence that Dr. Laber's opinions were based on Dr. Epstein's statements. Additionally, sufficient other testimony was allowed to demonstrate the background and bases of Dr. Laber's opinions. Concerning Dr. Peterson's statement, Dr. Laber was allowed to relate the fact that he had talked to other pathologists and medical people as a basis for forming his opinion. The express hearsay statement of Dr. Peterson would simply have been bolstering. At any rate, the same testimony given by Dr. Laber was also given by another expert, Dr. Rupp, so any error would, in our judgment, have been harmless beyond a reasonable doubt.

## IMPROPER REMARK BY
## THE WITNESS

▮ The argument is made that a mistrial should have been granted because of a statement made by Sergeant H.G. Welch of the Houston Police Department, who was a witness for the State. On cross-examination, Welch mistakenly referred to Kenneth Speering's written statement to the police, which was exculpatory in nature, as a confession. There is no evidence that he ever made a confession, either oral or written. The trial court dismissed the jury, heard defense counsel's argument for a mistrial, and overruled the motion, but agreed to instruct the jury to disregard the reference to a confession. After the jury returned, the trial judge admonished the jury to disregard for all purposes any mention of a confession. Defense counsel was then allowed to elicit from Officer Welch that he knew of no confession and that he had simply made a misstatement in referring to the written statement as a confession.

We find that the court's instruction and the clarifying testimony of Officer Welch were sufficient to cure any possible harm caused by the misstatement.

## DEADLY WEAPON FINDING

▮ In Point of Error 2, it is contended that it was error for the trial court to allow the jury to find that a deadly weapon was used in the commission of the offense, thereby restricting parole eligibility under Tex.Code Crim.Proc.Ann. art. 42.18, § 8(b) (Vernon Supp.1988). We agree.

The indictment charged Kenneth with using a knife. A knife is not a deadly weapon per se. *Polk v. State*, 693 S.W.2d 391 (Tex.Crim.App.1985). Thus, the State was required to give notice that it would seek a finding that a deadly weapon was used in the offense.

It is difficult to believe that one who is accused of *killing* another person *by using a knife* is not apprised of a contention that the weapon was deadly. Nevertheless, Texas law is settled that such an allegation is not sufficient notice of an intent to secure such a finding. *Ex parte Patterson*, 740 S.W.2d 766 (Tex.Crim.App.1987).

▮ The State argues that the defense had actual knowledge that a deadly weapon finding would be sought. The record reflects that after both sides rested in the guilt-innocence phase of the trial, the defense objected to the inclusion of a deadly weapon finding and the trial judge indicated that it had already removed such an issue from the charge. The State then objected to the omission of the deadly weapon finding, at which time the trial judge stated his belief that the issue would be more appropriately submitted during the punishment stage of the trial. The special issue was then included in the charge at the punishment hearing.

We do not believe the actual knowledge shown in this case is sufficient. The issue was not brought to the attention of defense counsel until after the evidence on guilt-innocence had been concluded and the charge on that phase completed. This kind of notice, in our judgment, does not comply with the requirements of *Patterson*. The judgment will be reformed to delete the deadly weapon finding.

▮ Alternatively, the State urges us to abate the appeal to the trial court for a hearing to determine if adequate and timely notice was given relative to the deadly weapon issue. We do not believe such a procedure would be appropriate in this case. The only allegation of facts constituting actual notice here is in the State's brief which we have cited above. Since we find those facts inadequate to show timely actual notice, there appears to be no need to abate the appeal for a further hearing on this issue. *Ex parte Carrasco*, 750 S.W.2d 222 (Tex.Crim.App.1988).

## CONSTITUTIONALITY OF THE
## DEADLY WEAPON
## SUBMISSION

A point is also raised that submitting a special issue on the use of a deadly weapon is unconstitutional because it infringes upon the executive branch's exclusive powers in the area of clemency and pardon.

Since we have sustained the point of error concerning the submission of this is-

sue to the jury in this case and are deleting the finding from the judgment, we need not consider this constitutional argument.

For the reasons stated, the judgment of the trial court is reformed to delete the finding that the offense was committed with a deadly weapon. As reformed, the judgment of the trial court is affirmed.